## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CHRISTOPHER A. AMBROSE,
                Plaintiff

                v.

BANDY X. LEE,
                Defendant

Case No.:

April 29, 2026

APR 29 2026 PM3:17
FILED-USDC-CT-NEW HAVEN

## COMPLAINT FOR DEFAMATION AND INVASION OF PRIVACY
## JURY TRIAL DEMANDED

### PRELIMINARY STATEMENT

1. This is a civil action for Defamation, Defamation *Per Se*, Invasion of Privacy by False Light, and Intentional Infliction of Emotional Distress arising from Defendant Bandy X. Lee's ("Lee" or "Defendant") repeated publication of false, highly defamatory, and malicious statements concerning Plaintiff Christopher A. Ambrose ("Plaintiff").

2. Specifically, Defendant has leveraged her professional credentials as a psychiatrist to publicly label Plaintiff a "psychopath" despite never having examined — or even met — him and falsely accuse him of committing acts of child sexual and emotional abuse, child trafficking, embezzlement, stalking, and additional criminal acts involving moral turpitude, as well as other reprehensible misconduct.

3. Plaintiff brings this action to hold Defendant accountable for an extrajudicial, internet-based campaign of character assassination that has caused significant and ongoing damage to Plaintiff's reputation, personal and professional standing, and emotional well-being.

4. As set forth below, Defendant made these accusations despite having access to authoritative findings directly contradicting them.

5. Plaintiff submits this revised Complaint in accordance with the Court's prior guidance, including the use of specific verbatim defamatory statements pleaded with particularity. To assist the Court in navigating a record involving more than three dozen separate defamatory publications, Plaintiff has excised extensive background information to focus strictly on the defamatory matters and has organized these materials into principal and supplemental sections. This format allows Plaintiff to present the full scope of Defendant's ongoing and repeated conduct—including numerous publications issued after the initial filing—while condensing repetitive "amplification" articles to maintain a manageable and efficient record of the massive scale of the harm.

## BACKGROUND FACTS AND FALSITY CONTEXT

6. Plaintiff and his ex-wife, Karen Riordan ("Riordan"), were divorced pursuant to a comprehensive 40-page Memorandum of Decision issued on April 26, 2022, by the Connecticut Superior Court. *See Ambrose v. Riordan*, FBT-FA19-6088163-S, Entry No: 520.10 (Conn. Super. Ct. Apr. 26, 2022) (The "Decision").

7. Following an exhaustive 28-day trial, spread over a calendar year, multiple investigations by the Madison Police Department, the Connecticut Department of Children and Families ("DCF"), and two separate medical centers, the Superior Court (Adelman, J.) determined that all allegations of child abuse levied against Plaintiff were entirely unsubstantiated.

8.  The Superior Court explicitly found that Riordan had actively coached the minor children to provide false testimony and fabricate abuse allegations against Plaintiff. Consequently, the Court awarded Plaintiff permanent sole legal and physical custody of the minor children. Riordan was prohibited from visiting or contacting the children until she consented to a full psychiatric evaluation. Riordan has refused to comply with this condition.

9.  Riordan subsequently engaged in unauthorized, covert contact with the children, removed them from the state in violation of court custody orders, and utilized third parties to transport them across multiple state lines to evade Plaintiff's custody.

10. As a result of this conduct, the Court (O'Neill, J.) issued protective orders on August 8, 2023 against Riordan on behalf of the three children. *See M.A. v. Riordan*, No. FBT-FA23-5052299-S (Conn. Super. Ct. 2023); *S.A. v. Riordan*, No. FBT-FA23-5052300-S (Conn. Super. Ct. 2023); *M.C.A. v. Riordan*, No. FBT-FA23-5052301-S (Conn. Super. Ct. 2023). In September 2023, Riordan was found in contempt of those protective orders.

## DEFENDANT LEE'S INVOLVEMENT

11. In or about April 2023, Riordan retained Defendant Lee, who presents herself as an expert in custody litigation and domestic violence, to conduct a psychiatric evaluation.

12. Despite knowing that she was not authorized by the court or by Plaintiff (the children's sole legal guardian) to treat the minor children, Defendant conducted an unauthorized interview with the parties' daughter, M.A., on April 23, 2023.

13. On May 30, 2023, Plaintiff formally notified Defendant via email that she was not permitted to communicate with his children. To ensure Defendant was fully aware of the material facts, Plaintiff provided Defendant with a copy of the 2022 Superior Court Decision detailing Riordan's documented lack of credibility and misconduct, including her coaching of the children to falsely accuse Plaintiff of abuse. Defendant later admitted under oath that she received and reviewed that Decision on or about May 30, 2023. Defendant also acknowledged she continued to communicate with the daughter.

14. Defendant maintains an online presence through various digital platforms, including personal websites and those under her "Family Court Violence" brand, through which she disseminates written and recorded content to a broad audience.

15. In these publications, Defendant presents herself as a psychiatric professional and commentator on family court matters, and she purports to offer expert analysis of cases, including the circumstances involving Plaintiff.

16. Defendant's statements are not confined to her own platforms; she regularly provides content, interviews, and materials to third-party media outlets who further publish and amplify her statements. Her primary collaborators include Frank Parlato, Jr., who publishes a blog (*frankreport.com*), and Richard Luthmann, who publishes on multiple platforms and hosts a podcast on which Defendant has discussed Plaintiff. Parlato and Luthmann are both federal felons convicted of crimes involving dishonesty, and both are close associates of Riordan, who hired Defendant.

17. Through these channels, Defendant's statements concerning Plaintiff have been widely disseminated and republished across her own and multiple third-party platforms.

18. In August 2023, at a contempt hearing against Riordan, the Court (O'Neill, J.) declined to qualify Defendant as an expert and refused to hear from her.

19. Armed with actual knowledge that the abuse allegations had been fully adjudicated as false by both the courts and state agencies, Defendant bypassed judicial procedures and delivered an unsolicited *ex parte* letter to the presiding judge (O'Neill, J.).

20. In this unsolicited communication — *which was refused and rejected by the Court* — Defendant leveraged her professional credentials to fabricate a narrative of shocking depravity. To alert the court that these are merely a few examples of the extensive falsehoods Defendant published, the letter included the following baseless assertions:

- That Plaintiff's 12-year-old son had recently reported being subjected to "anal penetration";

- That Defendant heard recordings of Plaintiff threatening his daughter with "vaginal penetration as punishment for minor misbehavior";

- That all three children had "reliably reported sexual abuse" but were ignored because Plaintiff had "intimidated all witnesses";

- That Plaintiff is a "violent man" and that sending the children to him would be dangerous; and

- That the children were living in "hell" under Plaintiff's "coercive control, verbal, emotional, and psychological abuse."

21. Defendant made these grotesque fabrications despite possessing actual knowledge that every single one of these claims had been thoroughly investigated by law enforcement and state

child protective agencies and had been adjudicated by the Superior Court as entirely unsubstantiated.

22. After the court rejected the letter, Defendant disseminated it containing these highly inflammatory and false allegations to third-party bloggers and also published the letter under her own name.

23. Defendant's continuous publications were not expressions of pure opinion. Instead, she presented her assertions as verified clinical findings made in her professional capacity. Defendant repeatedly asserted that she had "duly diagnosed" Plaintiff as a "psychopath," *despite never conducting a clinical examination or even meeting him.*

24. To heighten the perceived authority of her false accusations, Defendant frequently referenced her former affiliation with Yale University, which had terminated her from an unpaid position following findings concerning her medical knowledge, professional judgment, and ethics—including publicly diagnosing individuals with serious mental disorders without examining them in violation of the "Goldwater Rule," which is precisely what she has done to Plaintiff.

25. Defendant's termination from Yale was subsequently upheld by both this Court and the U.S. Court of Appeals for the Second Circuit. To further fabricate a false veneer of scientific credibility, Defendant stated she had professional roles at Harvard and Columbia Universities, both of which have denied that she ever held the positions she claimed.

26. On October 17, 2023, Plaintiff sent Defendant a formal cease-and-desist letter detailing the falsity of her statements and providing over a dozen court documents proving that public authorities had investigated and rejected the very narrative she put forth. Defendant Lee admitted under oath on September 23, 2024, that she received and reviewed this package.

27. Despite this indisputable, documented proof of falsity, Defendant continued her publication campaign, proceeding to publish statements that Plaintiff posed "extreme dangers," was keeping the children "locked in the basement," and was "trafficking them to pedophilic sex gangs."

28. In response to this relentless campaign of character assassination, Plaintiff initially filed a civil action for defamation against Defendant in March 2025.

29. Far from deterring her conduct, the filing of that lawsuit resulted in an escalation of Defendant's defamatory behavior. Defendant has continued to publish and broadcast demonstrably false statements against Plaintiff on various digital platforms, social media, and podcasts through the present day, with the most recent defamatory publications occurring as recently as February 22, 2026.

30. Defendant utilized her false and defamatory narrative against Plaintiff as a vehicle for commercial gain and professional promotion. Defendant leveraged these sensationalized claims to generate traffic and engagement across her digital platforms (including her "Family Court Violence" Substack and "Bandy X. Lee" Medium pages)—which propagate her beliefs

that the nation's family courts are corrupt and endanger, traffic, and murder children—in order to build an audience for a forthcoming book featuring Plaintiff's family.

31. This commercial motive constitutes significant evidence of actual malice, demonstrating that Defendant prioritized the expansion and profitability of her online brand over the verified judicial facts of Plaintiff's case.

32. Defendant's conduct has caused substantial harm to Plaintiff, including severe reputational injury, emotional distress, and ongoing damage resulting from the continued availability of these statements online.

33. This action seeks to hold Defendant accountable for the publication of false statements of fact that are not protected by the First Amendment. These publications form the basis of Plaintiff's claims, as described in detail below.

## THE PARTIES

34. Plaintiff Christopher Ambrose is a citizen of the State of Connecticut, residing in New Haven County.

35. Defendant Bandy Lee is a citizen of the State of New York, residing in New York County.

## JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

37. This Court has personal jurisdiction over Defendant pursuant to Conn. Gen. Stat. § 52-59b(a) because Defendant has transacted business within the State of Connecticut, and Plaintiff's claims arise directly from those business activities.

38. Defendant has purposefully availed herself of the privileges of conducting activities within Connecticut through extensive and deliberate contacts with the forum, including:

- **Professional Activities in Connecticut:** Defendant was retained by a Connecticut resident (Riordan) to conduct psychiatric evaluations and traveled to Connecticut to perform in-person professional services beginning in April 2023. These services were performed within Connecticut and constitute the transaction of business within the state.

- **Work with Connecticut-Based Subjects**: In connection with her evaluations and a related commercial project, Defendant conducted interviews in Connecticut with Connecticut residents and gathered material concerning Plaintiff's family, all of whom are Connecticut residents. These in-state activities were undertaken for professional and commercial purposes and formed a factual basis for Defendant's subsequent publications.

- **Participation in Connecticut Legal Proceedings**: Defendant voluntarily appeared in Connecticut court proceedings and submitted unsolicited *ex parte* communications to the Connecticut Superior Court, further evidencing her purposeful availment of the forum and its legal processes.

- **Communications with Connecticut Authorities**: Defendant repeatedly contacted Connecticut state agencies, including the DCF and the Madison Police Department, in her professional capacity regarding Plaintiff and his family.

39. Defendant's Connecticut-based activities were not incidental; they were deliberate, sustained professional and commercial undertakings that directly formed the foundation for the publications at issue.

40. Defendant published statements concerning Plaintiff, his ex-wife, and their children—all Connecticut residents—that were expressly directed at Connecticut, including references to Connecticut legal proceedings, courts, agencies, and officials. Defendant knew Plaintiff resided in Connecticut and that the reputational and other harm from her statements would be primarily felt in this forum.

41. As previously recognized by this Court in addressing Defendant's jurisdictional challenge in a related action, the exercise of personal jurisdiction over Defendant comports with due process because Defendant's conduct created "substantial connections" with Connecticut. These facts support the exercise of specific jurisdiction under the "effects test" articulated in *Calder v. Jones*, as Defendant expressly aimed her tortious conduct at Connecticut, knowing the brunt of the harm would be suffered here.

42. Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to

the claims occurred in this district, and the injury to Plaintiff's reputation was sustained in Connecticut.

DEFAMATORY STATEMENTS

**PRINCIPAL "CORNERSTONE" ARTICLES**

43. The following publications contain the principal and most damaging defamatory statements forming the core basis of Plaintiff's claims. These statements, most of which come from publications authored by Defendant herself, are representative of Defendant's direct defamatory campaign and are pleaded herein with particularity. Plaintiff has carefully reviewed and updated all cited publication links to ensure accuracy and accessibility. Where original hyperlinks have become inactive or unavailable, Plaintiff has identified such instances and provided alternative access information sufficient to locate and verify the referenced publication.

**Defamatory Statements published on August 3, 2023 on frankreport.com**

44. On August 3, 2023, Defendant made statements concerning Plaintiff in an article published on frankreport.com titled *Ambrose Continues to Terrorize His Teenage Children — His Crimes and Lies Exposed Part #1.* (available at: https://frankreport.com/2023/08/03/ambrose-continues-to-terrorize-his-teenage-children-his-crimes-and-lies-exposed-part-1/)

45. The publication identified Defendant as "one of the premier psychiatrists in custody and divorce cases" and presented her views as authoritative concerning Plaintiff.

46. The publication further stated that Defendant's views "warrant our fullest attention if we value the safety of the three teenage children who are the targets of Ambrose."

47. Defendant is quoted in the article as saying, "I have enough information to make a preliminary assessment of [Ambrose's] personality configuration… with an emphasis on the extent to which he may manifest characteristics of psychopathic personality."

48. Defendant further asserted as a professional matter that Plaintiff's psychopathy score of 32 was: "strongly suggestive that a diagnosis of psychopathy is present and justified—or, at the very least, that disturbing levels of psychopathic features are present."

49. Defendant further stated: "there should be an attempt to interview Mr. Ambrose… [as] this potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked."

50. Defendant further stated that: "the mentally ill person is not Riordan, but very likely Ambrose."

51. The publication included and hyperlinked to a letter authored by Defendant to her client, Riordan (Plaintiff's former spouse), dated May 3, 2023 (the "Riordan Letter"), which Defendant provided for public dissemination. Although the hyperlink within the article is now nonfunctional, this does not diminish the fact of publication, particularly where Defendant herself supplied the document for dissemination. Plaintiff possesses the Riordan Letter and a true and correct copy is attached hereto as **Exhibit A**.

52. In the Riordan Letter, Defendant stated that it was: "highly likely and reasonably reliable that your ex-husband suffers from psychopathy."

53. Defendant further represented that individuals with psychopathy: "mislead, cheat, or otherwise violate the rights of other people" and are "prone to lying, deceiving, and beguiling whoever is in their presence."

54. Defendant also stated that such individuals: "can be very destructive to society and to human beings they come in close contact with, such as family members."

55. The publication also included a report authored and submitted by Defendant to the Connecticut Department of Children and Families (the "DCF Report"), which Defendant provided for publication. A true and correct copy of the DCF Report is attached hereto as **Exhibit B**.

56. On information and belief, Defendant performed an extrajudicial publication of this confidential report by providing it to the third-party publication, where it was included as a screenshot.

57. In the DCF Report, Defendant stated that Plaintiff had engaged in: "sexual, psychological, emotional, verbal, and physical abuse, coercive control, and neglect."

58. Defendant further stated that Plaintiff had: "abducted and separated the children from their mother through litigation abuse."

59. Defendant also stated that Plaintiff exhibited a: "DANGEROUS PERSONALITY DISORDER." [Emphasis in the original].

60. Defendant further alleged that Plaintiff engaged in sexual misconduct involving the children, including: "inappropriately touching all children in sexual ways… penetrating or threatening to penetrate them… [and] bringing in adult men to sleep in their bedrooms without clothes."

61. Defendant also stated that Plaintiff had "controlled the Courts," thereby implying a corrupt or criminal interference with the judicial process, and engaged in "litigation abuse."

62. Defendant further asserted that Plaintiff's conduct placed the children at risk, describing his condition as indicating: "EXTREME POTENTIAL DANGER." [Emphasis in the original].

63. By intentionally providing her DCF Report—a document that would otherwise be confidential or potentially subject to a qualified reporting privilege—to a third-party blog for public dissemination, Defendant waived any claim of privilege or immunity. Such public disclosure was not made in the course of an official duty or to achieve the objects of a child protection investigation, but was instead an extrajudicial act of defamation designed to inflict maximum reputational damage against Plaintiff, the former husband of her client, Riordan.

64. Defendant represented that her conclusions were based on the Hare Psychopathy Checklist–Revised (PCL-R), a forensic diagnostic instrument, writing, "The Psychopathy Checklist–Revised (PCL-R), was performed on [Ambrose] on May 3, 2023." (The "Hare Psychopathy Checklist"). A true and correct copy of Defendant's published Hare Psychopathy Checklist is attached hereto as **Exhibit C**.

65. On information and belief, Lee provided this confidential diagnostic chart, containing her specific notations and professional evaluations, to the publication for public viewing.

66. Defendant performed this evaluation without ever examining, interviewing or even meeting Plaintiff.

67. Defendant wrote in the Riordan Letter, "An arrangement through criminal, domestic violence, or juvenile court to this end would best help protect you as well as the evaluator. Although I have the necessary qualifications through my twenty-five years of practice of forensic psychiatry, requisite training in the administration of the PCL-R, as well as specialization in dangerous personality disorders, a local forensic psychiatrist or forensic psychologist may more effectively be engaged in making a definitive diagnosis of your ex-husband."

68. At the time of publication, Defendant was aware of, or deliberately disregarded, judicial findings and prior investigations that did not substantiate allegations of abuse against Plaintiff and that he had been awarded sole legal and physical custody of the three children after these allegations had been investigated.

69. Defendant's use of expert authority and diagnostic professional evaluations were calculated to mislead readers into believing the allegations were verified facts.

70. The publication included materials and photographs identifying Plaintiff's minor children as alleged victims of sexual abuse and included statements attributed to them.

71. The publication also included images of Plaintiff in connection with the allegations of sexual abuse and other abhorrent conduct described above.

72. The statements and materials referenced in this publication repeated and amplified allegations concerning Ambrose's mental condition and alleged conduct, as described in ¶¶ 51-58.

73. The article included a hyperlink to materials authored and provided by Defendant Lee, including the Riordan Letter, DCF Report, Hare Psychopathy Checklist, and Defendant's professional qualifications (the latter is attached hereto as **Exhibit D)**, making these materials publicly accessible through online platforms.

74. The article generated hostile reader commentary concerning Plaintiff, demonstrating actual reputational harm.

**Defamatory Statements published on August 8, 2023 on frankreport.com**

75. On August 8, 2023, Defendant made additional statements concerning Plaintiff in an article published on frankreport.com titled *CT Judge Orders Teens Away From Mother; Ignores Claims of Father's 'Abuse'; Ambrose Teens Homeless* (available at: https://frankreport.com/2023/08/08/ct-family-court-judge-thomas-oneill-orders-ambrose-teens-away-from-mother-bars-riordans-contact-with-mia-matt-and-sawyer-for-one-year/#).

76. The article identified Defendant as a noted expert in child abuse and psychopathy and presented her statements as authoritative professional conclusions concerning Plaintiff.

77. The article included direct quotes from Defendant referring to Plaintiff as the children's "violent abuser" and claiming there was ample evidence that he was a psychopath.

78. The article also republished and linked to materials previously authored and, on information and belief, supplied by Defendant, including the Riordan Letter, the DCF Report, the Psychopathy Checklist, and Defendant's stated professional qualifications.

79. Notably, the article also published the full text of an August 8, 2023 letter authored by Defendant, addressed to Judge Thomas P. O'Neill of the Connecticut Superior Court (the "O'Neill Letter") and delivered—unsolicited—to him.

80. *Waiver of Privilege.* Although the O'Neill Letter was styled as a communication to a judicial officer, the Superior Court had rejected Defendant as an expert and expressly refused to hear from her. Undeterred, Defendant deliberately circumvented that ruling by sending the Court the O'Neill Letter, which the Court refused, unread. Nevertheless, Defendant disseminated the unsolicited, judicially rejected document to third-party bloggers—including Frank Parlato and Richard Luthmann—and republished it under her own byline on platforms such as Substack and Medium for mass public consumption. This was not a good-faith effort to participate in litigation; it was a calculated effort to inject inadmissible allegations into the public domain after the Court had barred their use in the proceeding. By weaponizing the Letter in this manner, Defendant forfeited any conceivable claim to absolute litigation privilege. Such extrajudicial publication bears no relation to the legitimate objects of litigation and instead reflects both an intentional abuse of the judicial process and actual

malice, in that Defendant knew the allegations lacked judicial acceptance and reliability yet republished them to maximize reputational harm to Plaintiff.

81. In the O'Neill Letter, Defendant stated: "I must warn against your sending Ms. Karen Riordan's children to Mr. Christopher Ambrose. He is no ordinary violent man."

82. Defendant further stated: "I have heard recordings of Mr. Ambrose's threatening the daughter with vaginal penetration as punishment for minor misbehavior."

83. Defendant also stated: "All three children have reliably reported sexual abuse, and no one has believed them, frankly, because the father is so threatening, he has intimidated all witnesses."

84. Defendant further stated: "The 12 (now 13)-year-old recently reported anal penetration."

85. Defendant also stated that the children had been living in "hell" because of Plaintiff's alleged "coercive control, verbal, emotional, and psychological abuse, and isolation from the mother."

86. Defendant further stated that Plaintiff "found out their address," "hunted [the daughter] down," and "stalked her everywhere in his car, almost causing her to have an accident."

87. Defendant also stated that the children exhibited "objective signs of severe trauma," including resorting to substances, self-harm, and suicidal thoughts while living with Plaintiff.

88. Defendant also stated, "(T)hese are children who have reported being severely punished if they ever gave a true report of Mr. Ambrose's abuse against them, and DCF should know that this threatening behavior is common among the most dangerous individuals."

89. Defendant further asserted that child protective services could not be trusted to clear Plaintiff because, in her words, "Mr. Ambrose is just such an individual," referring to someone having one of "the most dangerous personality disorders."

90. Defendant made the foregoing statements without ever examining, interviewing, or even meeting Plaintiff.

91. Defendant also referred to Plaintiff as Riordan's "violent abuser."

92. Defendant further stated that Plaintiff "was able to hire [his 'high-powered attorney'] only because he embezzled [Riordan's] inheritance and stole everything she had." This statement is a provably false allegation of criminal conduct and financial impropriety that falls entirely outside Defendant's purported role as a psychiatric expert.

93. Defendant also stated: "It came out during the proceeding that this violent man... did not stop even when he rendered his ex-wife homeless."

94. Defendant further stated that Plaintiff "lost his law license and was fired multiple times." This statement is a provably false assertion of facts concerning Plaintiff's professional history and character, made with the intent to injure Plaintiff in his reputation and profession.

95. At the time of publication, Defendant acted with actual malice or reckless disregard for the truth by ignoring the specific findings of the April 26, 2022, Decision in *Ambrose v. Ambrose*, which stated that none of the allegations concerning the mistreatment of the children had been substantiated.

96. Defendant further disregarded the findings set forth in the April 26, 2022 Decision, which expressly addressed and resolved the issue of the alleged "inheritance," thereby undermining any basis for her embezzlement claim. As reflected on page 32 of The Decision, the Court reviewed the parties' financial history and found no misconduct by Plaintiff of any kind, rendering Defendant's accusation a provably false assertion of criminal activity. The Decision likewise allocated the parties' assets on pages 38–39, confirming that Riordan's subsequent financial condition, including any claim of homelessness, was not attributable to Plaintiff. Defendant's publication of statements contrary to these express judicial findings supports a reasonable inference of actual malice, in that she either knew her assertions were false or acted with reckless disregard for their truth.

97. The article identified Plaintiff's minor children by name, included images of Plaintiff and the children, and associated them publicly with allegations of sexual abuse.

98. The article was publicly accessible online and generated hostile and threatening reader commentary concerning Plaintiff. This commentary, which specifically referenced Defendant's "expert" psychiatric labels and the "embezzlement" claim, demonstrates the actual and immediate harm to Plaintiff's reputation and safety.

99. Each of the specific allegations of sexual, physical, and emotional abuse contained in ¶¶ 85 - 93 is false. These claims have been investigated by the DCF and local law enforcement, and have been the subject of multiple judicial inquiries and rulings; in every instance, the allegations were found to be unsubstantiated.

**Defamatory Statements *written by Defendant Lee* and published on October 8, 2023 on frankreport.com**

100. On October 8, 2023, Defendant Bandy X. Lee authored and published an article titled "The Egregious Case of Christopher Ambrose: How CT Family Court Failed Karen Riordan and Her Children." (The article is available here: https://frankreport.com/2023/10/08/famed-pyschiatrist-dr-bandy-x-lee-the-egregious-case-of-christopher-ambrose-how-ct-family-court-failed-karen-riordan-and-her-children/ ).

101. In the article, Defendant held herself out as a forensic psychiatrist and "court expert witness," and claimed she had "special privy to what truly happened against the Family Court's fabricated narratives."

102. Defendant further represented that she relied on "victim reports," "multiple collateral interviews," and "about four dozen objective documents, including audio recordings, video recordings, photographic evidence, and professional reports."

103. Defendant further wrote that Plaintiff "had been fired more than once and also lost his law license."

104. Defendant wrote: "The absentee father seized the opportunity to marry her in the midst of suddenly losing her mother…"

105. Defendant wrote that Plaintiff married his former spouse "as a predatory move to steal her inheritance and hide his homosexuality."

106. Defendant wrote that Plaintiff "reached a full diagnosis of psychopathy — a score of 32/40."

107. Defendant further wrote that such score "should raise many alarms and possibly be a contraindication to parenting."

108. Defendant wrote that "the children's lives appear to be in danger."

109. Defendant further wrote: "Psychopathy is a disorder of empathy and conscience, where an individual is incapable of loving emotions but is driven to harm living beings, including one's own children."

110. Defendant wrote that individuals with such traits "wreak havoc" in the lives of others.

111. Defendant wrote that Plaintiff "showed himself to be racist, taunting these children, the older two who are Guatemalan and the youngest half-Mexican, for their heritage."

112. Defendant further wrote that Plaintiff "showed himself as a sadist, deliberately causing the family dog's death and killing the children's pet crabs."

113. Defendant further wrote that Plaintiff "orchestrated the demise of the children's beloved dog, Cody."

114. Defendant wrote that Plaintiff engaged in "emotional, psychological, physical, and sexual abuse of the children."

115. Defendant further wrote that Plaintiff "first attempted to cover up his emotional, psychological, physical, and sexual abuse of the children."

116. Defendant wrote that Plaintiff "took the doorknobs off the doors to ensure the children could not bar him from their bedrooms."

117. Defendant further wrote that "when the children tried to report their sexual abuse to medical providers, Ambrose took away their phones and Internet access and constantly threatened them."

118. Defendant wrote that the children were "constantly harassed, without privacy, even in the bathroom."

119. Defendant wrote: "In my investigation, I heard recordings of Ambrose threatening the daughter with vaginal penetration as punishment for minor misbehavior."

120. Defendant further wrote: "The 12-year-old's sexual assault was documented in a recording of his screams."

121. Defendant described purported recordings, writing: "Here, we hear Ambrose threatening Mia, suggesting a harsh punishment for an unacceptable action."

122. Defendant further wrote: "His parenting style leans towards aggression, possibly even crossing legal boundaries."

123. Defendant also wrote: "The phrase 'dig it in deep' leaves us questioning its underlying meaning."

124. Defendant further described video evidence, writing that it showed "the chilling screams of a child echoing in the background," which she identified as Plaintiff's son.

125. Defendant wrote: "Adult men were invited to sleep in the 16-year-old daughter's room, bringing drugs and engaging in intercourse with other underage girls."

126. Defendant wrote that Plaintiff turned the situation into "a money-making enterprise by holding the children hostage."

127. Defendant further wrote that Plaintiff was "demanding child support."

128. Defendant wrote that Plaintiff "hunted her down over the Connecticut confidential address program Riordan enrolled in and stalked her with a car, almost getting her into a serious accident."

129. Defendant further wrote that Plaintiff "tried to use the police to force Mia back to his home."

130. Defendant wrote that Plaintiff "manipulates the Connecticut Family Court system."

131. Defendant further wrote that Plaintiff used legal strategies to "continue his abuse with impunity."

132. Defendant also wrote that Plaintiff "persuaded Judge ONeill to issue a restraining order" against the children's mother.

133. Defendant further portrayed Plaintiff as part of a broader system of criminal conduct, stating: "Never in my 25 years of practice did I imagine there would be an 'alternative court,' that deals in criminal child trafficking…"

134. The foregoing statements would be understood by a reasonable reader as assertions of fact that Plaintiff: (a) is a diagnosed psychopath; (b) is a danger to his children; (c) engaged in emotional, physical, and sexual abuse of his children; (d) made sexual threats and committed sexual assault; (e) is racist and sadistic; (f) exposed his children to drugs and sexual activity involving minors; (g) stalked and endangered his child; (h) engaged in serious professional misconduct; and (i) manipulated courts to continue abusive or unlawful conduct.

135. These statements accuse Plaintiff of serious criminal conduct, moral depravity, and professional dishonesty, and constitute defamation *per se*.

136. Defendant published the foregoing statements with actual malice, that is, with knowledge of their falsity or reckless disregard for the truth.

137. Defendant did not present these accusations as rumor or opinion, but as the purported conclusions of a forensic psychiatrist who claimed to have reviewed "objective documents, including audio recordings, video recordings, photographic evidence, and professional reports," and to possess "special privy to what truly happened against the Family Court's fabricated narratives."

138. Despite invoking such purported evidentiary support, Defendant either knew that the cited materials did not substantiate her accusations or consciously disregarded a high probability that they did not.

139. In particular, Defendant relied on purported audio recordings to assert that Plaintiff made sexual threats and committed abuse, including statements that such conduct was "documented" in recordings, yet those materials were not presented in any manner that resulted in substantiation by law enforcement, child protective authorities, or any court, and did not support the extreme conclusions Defendant drew from them.

140. Defendant further disregarded readily available and authoritative sources—including court proceedings and findings—that directly contradicted her narrative, while adopting and amplifying allegations from a biased source aligned with her client.

141. By presenting inflammatory accusations of criminal conduct, sexual abuse, racism, and psychopathy as verified fact grounded in purported expert analysis and "objective" evidence, Defendant acted with reckless disregard for the truth.

142. In short, Defendant manufactured a narrative of criminal abuse and then falsely presented it as the product of expert analysis and "objective" evidence, evidencing a knowing or reckless disregard for the truth.

143. By embedding such links within an article presenting sensational allegations of criminal conduct, Defendant used the publication to promote her professional identity and increase visibility for her work and platforms.

144. While the article purports to comment on family court proceedings, Defendant did not confine her statements to general commentary or opinion about the judicial system. Instead, she made specific factual assertions about Plaintiff, including allegations of criminal conduct, including child sexual abuse, and psychological diagnosis, which are capable of being proven true or false.

145. Defendant's use of a broader narrative concerning alleged systemic misconduct in family courts served as a vehicle to publish and amplify these specific factual accusations about Plaintiff, rather than as abstract political or social commentary.

146. The October 8, 2023 Article includes images and identifying information concerning Plaintiff's children and portrays them as victims of sexual abuse and Plaintiff as a dangerous perpetrator.

147. By publishing these allegations alongside such identifying information, Defendant amplified the reputational harm to Plaintiff and exposed his children to public stigma and emotional distress.

148. The statements described herein are false. At no time did Plaintiff engage in any of the conduct alleged by Defendant, including but not limited to the acts of abuse, sexual misconduct, threats, racism, cruelty, stalking, or professional wrongdoing described in the October 8, 2023 Article.

149. The statements described herein were false and defamatory and have caused, and continue to cause, severe reputational and emotional harm to Plaintiff and his family.

**Defamatory Statements *written by Defendant Lee* and published on October 17, 2023 on medium.com**

150. On October 17, 2023, Defendant authored and published an article on her medium.com site titled *A Corrupt Family Court-Protected Perpetrator's Cease-and-Desist Letter,"* with the subheading *"A Dramatic Case of Projective Identification and Victim-Offender Reversal.* (Available at https://bandyxlee.medium.com/a-corrupt-family-court-protected-perpetrators-cease-and-desist-letter-3b7a5c2b479d.

151. Prior to this publication, Plaintiff served Defendant with a cease-and-desist communication requesting that she stop publishing false statements and cease violating the privacy of Plaintiff and his minor children.

152. Plaintiff also provided numerous judicial decisions and other court documents demonstrating the falsity of Defendant's claims.

153. Defendant responded to Plaintiff's cease-and-desist communication by publishing the letter in its entirety within the article, along with additional statements falsely characterizing Plaintiff as mentally unstable and dangerous.

154. Defendant published these statements on her own platform, over which she exercised exclusive editorial control, and did so with full knowledge of Plaintiff's objections to her prior statements.

155. In the article, Defendant wrote: "Any emotionally-balanced person will be able to recognize that [Plaintiff's cease and desist letter] is not the issuance of a healthy individual."

156. Defendant further wrote: "Those with a forensic background will find a treasure trove of relentless deflection, obsessive control, aggressive victim-offender reversal, and delusional-level projective identification."

157. Defendant also stated that those experienced with "violent perpetrators" would be able to assess the "extreme dangers" Plaintiff poses.

158. Defendant represented a clear intent to involve authorities by writing: "I will be contacting the local police, the state police, the district attorney's office, and the FBI."

159. Defendant further wrote: "Since I immediately reported Ambrose's threats to the police, he could not write to me again."

160. This statement is false and misleading. At no time was Plaintiff legally or physically prevented from contacting Defendant by law enforcement or any court order. Furthermore, Plaintiff's sole communication with Defendant has been the single cease-and-desist letter described above, which contained no threats, but rather a formal request for the cessation of defamatory conduct.

161. Defendant further characterized Plaintiff as a "dangerous" individual whose conduct warranted law enforcement attention."

162. Defendant wrote: "[W]arning: if you find yourself sympathizing with [Plaintiff] duly-diagnosed of psychopathy, who has committed unspeakable crimes against his ex-wife and children, including keeping them locked in the basement and trafficking them to pedophilic sex gangs…"

163. These allegations—including that Plaintiff confined his children and trafficked them to "pedophilic sex gangs"—are categorically false and lack any factual basis. In response to a

reader comment on the same platform, Defendant wrote: "When every word is a lie… such persons are extremely dangerous."

164. Defendant further wrote: "Psychopathy is the diagnosis of serial rapists and mass murderers, and the actual deeds of this man would match."

165. Defendant falsely asserted personal knowledge of evidence, writing: "I have seen the objective evidence, and his three children have seen and suffered the most unspeakable things… reaching the brink of death numerous times."

166. Defendant made the foregoing statements without ever examining, interviewing, or meeting Plaintiff, yet presented them as professional psychiatric conclusions.

167. Defendant's statements repeated and amplified prior false allegations concerning psychopathy, child abuse, and dangerousness described throughout this Complaint.

168. These defamatory materials were made publicly accessible and remain searchable through online platforms, demonstrating the ongoing harm to Plaintiff's reputation and the safety of his family.

**Defamatory Statements *written by Defendant Lee* and published on October 21, 2023 on <u>frankreport.com</u>**

169. On October 21, 2023, Defendant authored and published an article on frankreport.com titled *"Forensic Psychiatrist Bandy Lee Faces Threats, Slander for Advocating for Ambrose Teens."* (available at: <u>https://frankreport.com/2023/10/21/forensic-psychiatrist-bandy-lee-faces-threats-slander-for-advocating-for-ambrose-teens/</u>)

170. In the article, Defendant presented herself as an expert with detailed knowledge of Plaintiff and the underlying family court matter, stating: "I have written about Karen Riordan, because I know the case in detail as an expert witness…"

171. Defendant wrote that the children had: "suffer[ed] three years of unspeakable abuse."

172. Defendant further stated that she: "interviewed the daughter within 24 hours of her running away from her violent abuser-father."

173. Defendant published and endorsed as credible a statement attributed to Plaintiff's minor child accusing Plaintiff of criminal sexual abuse, writing that the child stated: *"He sexually abused me. He emotionally abused me…."*

174. Defendant further amplified allegations of extreme and ongoing abuse by describing a system in which children are *"traffick[ed]… to their abuse, rape, and murder,"* in a context directly tied to Plaintiff and his family court proceedings.

175. Defendant also attributed to Plaintiff statements allegedly threatening that his children would be subjected to severe physical and sexual violence, writing that Plaintiff warned they would be sent to a facility where they would be *"beaten, raped, and abused on a daily basis."*

176. Defendant described Plaintiff as a "violent perpetrator" and characterized the children as "innocent victims" fleeing from him, thereby reinforcing and repeating the allegation that Plaintiff engaged in ongoing violent and abusive conduct toward his children.

177. Defendant repeatedly referred to Plaintiff as the children's "violent abuser."

178. Defendant further characterized Plaintiff as a protected "violent perpetrator," asserting that *"violent perpetrators are protected"* by the courts in a context explicitly referring to

Plaintiff, thereby reinforcing the accusation that Plaintiff engaged in serious violent misconduct toward his children.

179. Defendant wrote that Plaintiff had sent her a "threatening letter" and that she reported Plaintiff to the police.

180. Defendant further wrote: "Ambrose hunted [the children] down and either sent the police or tried to manipulate their guardian into releasing them."

181. Defendant also stated that Plaintiff: "executed a four-hour standoff, threatening the children that if they did not return… they would go to a juvenile facility."

182. Defendant wrote that Plaintiff's conduct—including alleged "obsession," "veiled threats," and "weaponisation of courts"—were: "signs of psychopathy."

183. Defendant wrote, in a declarative statement presented as fact: "Ambrose won't let his children live with their mother or allow them to be happy anywhere."

184. Defendant wrote that one child improved "dramatically" after leaving Plaintiff and experienced "the calm of a non-threatening environment for the first time in years."

185. The article incorporated and linked to Defendant's prior publication titled *"An 'Alternative Court' of Unspeakable Criminality, Violence, and Abuse,"* described in ¶349 below.

186. Defendant made the foregoing statements without ever examining, interviewing or even meeting Plaintiff.

187. At the time of publication, Defendant was aware of, or deliberately disregarded, judicial findings and prior investigations that did not substantiate allegations of abuse against Plaintiff.

188. Defendant's defamatory statements were made publicly accessible and remain searchable through online platforms. This accessibility has resulted in public commentary that explicitly cites Lee and her professional credentials to validate attacks on Plaintiff's reputation, demonstrating the ongoing and measurable harm caused by Defendant's statements.

**Defamatory Statements *written by Defendant Lee* and published on September 28, 2024 on Substack.com**

189. On September 28, 2024, Defendant co-authored with Richard Luthmann an article on article published on substack.com titled *Lying to the Feds? No Problem for CT Judge Thomas O'Neill in Ambrose Family Court Case* (Available here: https://luthmann.substack.com/p/lying-to-the-feds-no-problem-for).

190. The article concerns Plaintiff and purports to report on proceedings in *Ambrose v. Riordan*, while presenting Defendant as an expert source with specialized knowledge of Plaintiff's character, conduct, and alleged criminal behavior.

191. In the headline and subheading, Defendant made the following statements concerning Plaintiff: "Christopher Ambrose, a diagnosed psychopath, lied to federal agents and committed heinous crimes."

192. The article further states: "Connecticut Judge Thomas J. O'Neill refused to allow damning testimony about Christopher Ambrose's lies to federal agents and other heinous crimes into the record."

193. Defendant also asserts that Plaintiff is "a dangerous psychopath," and suggests that the presiding judge may have been "hoodwinked by a dangerous psychopath."

194. The article represents as fact that Plaintiff was "diagnosed as a psychopath," and further claims that Plaintiff "scored a 32 out of 40 on the Hare Psychopathy Checklist, a score that places him in the highest category of danger."

195. Defendant further claims that Plaintiff engaged in criminal conduct, including the following statement attributed to Defendant: "Ambrose lied to federal agents, leading to a SWAT team raid at the home of a friend of Karen Riordan... He claimed the children were there, which was completely false."

196. The article expressly characterizes such alleged conduct as criminal, stating: "Lying to federal agents is also a crime, violating 18 U.S.C. § 1001," and asserts that Plaintiff "has subjected himself to potential federal prosecution by the U.S. Attorney for the District of Connecticut."

197. Defendant further asserts that Plaintiff has engaged in a broader "pattern of deception and abuse that puts everyone around him at risk," thereby portraying Plaintiff as an ongoing danger to others.

198. The article repeatedly characterizes Plaintiff's alleged conduct as involving "heinous crimes," "dangerous behavior," and "manipulation of law enforcement," presented as statements of fact rather than opinion.

199. Defendant also implies that material evidence of Plaintiff's alleged wrongdoing exists but has been improperly excluded, stating that "critical details of Ambrose's crimes [were] hidden from public view" due to the actions of the presiding judge.

200. The article further suggests that the judge may be acting improperly or with bias in Plaintiff's favor, asking: "Why Judge Thomas J. O'Neill is so determined to protect Christopher Ambrose," and insinuating that the judge may be "complicit."

201. The foregoing statements are false. Plaintiff has not been "diagnosed as a psychopath," has not committed "heinous crimes," has not lied to federal agents, has not violated 18 U.S.C. § 1001, and has not engaged in any conduct remotely resembling the criminal and dangerous behavior described in the article.

202. The statements described above accuse Plaintiff of serious criminal conduct, including federal crimes, dishonesty toward law enforcement, and dangerous and abusive behavior. Such statements constitute defamation per se, as they impute criminal conduct and moral turpitude to Plaintiff and tend to injure him in his profession and reputation.

203. In addition, Defendant's repeated characterization of Plaintiff as a "psychopath," including the assertion that he was formally "diagnosed" and scored in the "highest category of danger," falsely portrays Plaintiff as having a severe and dangerous mental disorder, further subjecting him to public hatred, contempt, and ridicule. Defendant published these statements as purported facts, not opinion, and attributed them to her own claimed expertise as a forensic psychiatrist, thereby lending them an appearance of medical and scientific authority.

204. The article quotes Defendant as stating: "Ambrose's dangerousness, his lies to law enforcement, his abuse of the children—none of it was allowed to stay in the testimony." This statement asserts as fact that Plaintiff abused his children and engaged in criminal deception.

205. The article further states that Defendant "came to the medical conclusion that Christopher Ambrose is a psychopath," and that she "reported serious allegations of child molestation to the Connecticut Courts."

206. The article emphasizes that Defendant, "as a mandated reporter," filed reports of suspected child abuse or neglect "for each of the Ambrose children," and describes her accusations as "unequivocal."

207. The article explains "DARVO" as a tactic used by abusers and then applies that label directly to Plaintiff, asserting that Plaintiff is an abuser who manipulates victims and reverses roles to evade accountability.

208. The article further claims that Plaintiff has "used the court system… to keep the focus off of his own criminal actions," and asserts that there exists "evidence of his manipulation and abuse," presenting such assertions as established fact.

209. The article also states that Plaintiff has engaged in "manipulation of the legal process" and has maintained "control over the narrative," reinforcing the false portrayal of Plaintiff as deceitful, abusive, and dangerous.

210. The article further attributes to Defendant statements impugning Plaintiff's character and alleging extreme misconduct, including: "Ambrose's crimes," "his abuse of the children," and "overwhelming evidence of his psychopathy and dangerousness."

211. The article states that Defendant, acting as a "mandated reporter," submitted reports to the Connecticut DCF describing "the danger Ambrose posed to his children," including allegations of "child abuse and Ambrose's manipulation of federal law enforcement." The

article further claims that Defendant's reports to DCF contained "details of child abuse" by Plaintiff and that such reports were improperly disregarded.

212. The statements described above are false. Plaintiff has not abused his children, has not committed child molestation, has not engaged in criminal conduct, and has not manipulated law enforcement or the courts.

213. These statements constitute defamation *per se* in that they falsely accuse Plaintiff of serious criminal conduct, including child abuse, sexual misconduct, and other acts of moral turpitude, and further tend to injure Plaintiff in his profession and reputation. The article, taken as a whole, conveys to the ordinary reader that Plaintiff is an abusive parent, a sexual predator, a manipulative individual who exploits both law enforcement and the courts, and a continuing danger to his children and others.

214. The article asserts, as fact, that Plaintiff's daughter "previously reported sexual penetration by Christopher Ambrose through her appointed Attorney for the Child."

215. The article repeats and reinforces this accusation by stating: "Mia Ambrose complained about sexual penetration by Christopher Ambrose. So did Dr. Bandy Lee, and maybe others." The article presents these accusations as credible and unrefuted, asserting that such complaints "were ignored by DCF."

216. The article further characterizes the alleged conduct as "child rape," stating: "Child rape is ignorable, while possible truancy deserves their full resources and focus."

217. The article also claims that the State of Connecticut previously determined Plaintiff to be dangerous, stating: "A Connecticut Court Risk Assessment from December 2020… determined Christopher Ambrose was HIGH RISK for potential danger to his children."

218. The article quotes Private Investigator Manuel Gomez as stating: "Mr. Ambrose molests his children," and alleges that this statement was communicated to federal authorities, including the FBI and a United States Attorney.

219. The article further characterizes Plaintiff as "The Leonardo da Vinci of Liars."

220. The article asserts that "the statements of professionals overwhelmingly corroborate the serious allegations of Christopher Ambrose's child molestation," and further alleges that Plaintiff "prefers young Latin boys."

221. The article goes on to claim that "physical evidence from his computer hard-drives also backs it up," and asserts that Plaintiff "frequents pornographic websites of underage Latino boys," explicitly referencing criminal conduct by stating that "child pornography possession is a crime." The article reinforces this accusation by listing purported file names and descriptions allegedly derived from Plaintiff's computer, which are described in explicitly sexual terms involving minors.

222. The article further alleges that Plaintiff's home is "a den of iniquity," and claims that "underage girls are apparently plastered with alcohol then (statutorily) raped."

223. The article asserts that state authorities are aware of these alleged acts, stating that "DCF knows all of this, they have seen the published pictures."

224. The statements described above are false. Plaintiff has not engaged in sexual penetration, sexual abuse, or rape of his children, has not accessed or possessed child pornography, and has not engaged in or facilitated statutory rape.

225. The statements described above constitute defamation per se, as they falsely accuse Plaintiff of the most serious criminal conduct, including sexual assault of a minor and child pornography, and subject him to public hatred, contempt, and ridicule.

226. These statements constitute defamation *per se*, as they falsely accuse Plaintiff of the most serious criminal offenses, including child molestation, possession of child pornography, and sexual exploitation of minors, all of which subject Plaintiff to extreme public hatred, contempt, and reputational harm.

227. The article, taken as a whole, conveys to the ordinary reader that Plaintiff is a serial sexual predator of children, engaged in ongoing criminal conduct involving minors and protected only by institutional failure.

228. Defendant published the foregoing statements with actual malice, that is, with knowledge of their falsity or with reckless disregard for whether they were true or false.

229. By co-authoring, publishing, and disseminating the article, Defendant adopted, endorsed, and republished the statements contained therein, including those attributed to third parties, and is liable for their publication as if she had made the statements herself.

230. Defendant purported to act as an expert source with specialized knowledge of Plaintiff, including asserting clinical conclusions and reporting alleged criminal conduct, yet failed to undertake any reasonable steps to verify the truth of the extraordinary accusations made in the article.

231. Defendant relied on and repeated allegations from inherently biased and unreliable sources, including individuals aligned with Plaintiff's litigation adversaries, while disregarding readily available information contradicting those claims.

232. As a direct and proximate result of Defendant's publication of the foregoing statements, Plaintiff has suffered and continues to suffer substantial harm, including damage to his reputation, personal humiliation, mental anguish, and emotional distress. The statements at issue falsely accuse Plaintiff of serious criminal conduct, including sexual abuse of children, possession of child pornography, and other acts of moral turpitude, and therefore constitute defamation per se, entitling Plaintiff to presumed damages. In addition, Defendant's publication has caused and will continue to cause actual damages, including harm to Plaintiff's personal and professional relationships, and has exposed Plaintiff to public hatred, contempt, and ridicule. Plaintiff further seeks recovery of all available damages, including general, special, and punitive damages, in an amount to be determined at trial.

**Defamatory Statements *written by Defendant Lee* and published on September 29, 2024 on <u>medium.com</u>**

233. On September 29, 2024, Defendant authored and published an article on her medium.com site titled *Cease and Desist Letter,* with the subheading *Against Mr. Christopher Ambrose — but the Real Problem is the Family Courts* (available at: https://bandyxlee.medium.com/cease-and-desist-letter-fc7a475ebd81).

234. The article purports to discuss family court misconduct but presents numerous factual assertions concerning Plaintiff based on Defendant's claimed expertise as a forensic psychiatrist.

235. Defendant refers to Plaintiff as "the violent father who was awarded sole custody of his three children," asserting as fact that Plaintiff is violent.

236. Defendant claims Plaintiff engaged in criminal conduct, stating he had been "stalking and harassing (her) for almost a year and a half to intimidate (her) as a witness."

237. The article asserts Plaintiff is an abuser and his children are "suicidal and self-harming children" who "risked everything to run away from their violent father."

238. Defendant alleges Plaintiff's minor daughter was "hiding from her father" and had been "raped for the third time," conveying that Plaintiff is responsible for or complicit in such abuse.

239. Defendant claims she "testified" to these alleged facts, presenting the accusations as sworn, credible evidence.

240. Defendant characterizes Plaintiff as one of several "sick, disturbed, and dangerous abusers" allegedly protected by family courts.

241. The article accuses Plaintiff of "litigation abuse" asserting that courts "condon[e] litigation abuse" in cases such as Plaintiff's, implying that he exploits the system to harm others.

242. Defendant represents these statements as factual assertions, relying on her claimed role as a forensic psychiatrist with specific knowledge of the underlying family court matter, thereby lending them an appearance of professional and evidentiary authority.

243. Defendant claims Plaintiff engaged in "unsolicited contact" and "harassed (her) with letters consisting of dozens, if not hundreds, of pages of threatening and coercive content."

244. Defendant asserts Plaintiff has a history of "targeting, intimidating, and retaliating against witnesses" by contacting their employers to get them fired, stating "which has happened to two people so far."

245. Defendant demanded Plaintiff "cease and desist contacting, stalking, and/or harassing (her) or any of (her) past or present affiliates," thereby asserting as fact that Plaintiff had engaged in stalking and harassment.

246. Defendant stated: "I reported you to multiple police precincts because of your unsolicited contact of me."

247. Defendant asserted Plaintiff engaged in criminal witness intimidation: "I believe you are attempting to tamper with and intimidate me as a witness."

248. In a further effort to destroy Plaintiff's reputation and portray them as a criminal, Defendant published the following false and defamatory statements:

- False Claim of Police Reports: Defendant stated, "I reported you to multiple police precincts because of your unsolicited contact of me." This statement is demonstrably false, as Defendant never filed such reports. By fabricating these reports, Defendant intentionally created the false and highly offensive impression that Plaintiff was the subject of multiple criminal investigations.

- False Accusation of Witness Tampering: Defendant asserted, "I believe you are attempting to tamper with and intimidate me as a witness." While phrased as a belief, this statement constitutes Defamation Per Se as it falsely accuses Plaintiff of the crime of witness tampering. This "opinion" is based on non-existent facts and was made with reckless disregard for the truth to further malign Plaintiff's character.

249. Defendant claimed she had "affirmed your extreme violence against your children and ex-spouse."

250. Defendant represented that Plaintiff had been clinically evaluated, stating she affirmed "your preliminary diagnosis of a dangerous personality disorder."

251. Defendant alleged Plaintiff caused others to be "exhausted or frightened" by his conduct.

252. Defendant alleged criminal conduct involving federal authorities: "On one occasion, you manipulated the FBI and orchestrated a false SWAT raid, based on pathological lies."

253. Defendant stated these actions formed the basis of a clinical diagnosis: "This is the very material I examined for your preliminary diagnosis of psychopathy."

254. Defendant accused Plaintiff of abusive litigation tactics: "you filed an astounding sixty motions, all in order to 'DARVO' (deny, attack, and reverse victim and offender), so that you might deflect from charges against you."

255. Defendant concluded by asserting Plaintiff is mentally unstable: "Through these extreme actions, you are only confirming that you are dangerously disturbed, and that my diagnosis of your dangerous disorder is probably correct."

256. All of the foregoing statements are false. Plaintiff has not engaged in stalking, harassment, witness intimidation, violence, child or spouse abuse, manipulation of the FBI, the courts, or any other misconduct described.

257. These statements constitute defamation *per se*, as they falsely accuse Plaintiff of serious criminal conduct and dangerous mental illness, subjecting him to public hatred and contempt.

258. Defendant published these statements with actual malice, relying on her professional authority as a forensic psychiatrist to lend weight to claims she knew were false or published with reckless disregard for the truth.

259. By publishing the private cease-and-desist letter in full to a public audience, Defendant intentionally amplified these false accusations, presenting them as factual assertions and reinforcing the defamatory narrative concerning Plaintiff.

260. Defendant published the foregoing statements with actual malice, that is, with knowledge of their falsity or with reckless disregard for whether they were true or false. In the September 29, 2024 publication and the embedded cease-and-desist letter, Defendant repeated and escalated prior accusations against Plaintiff—including allegations of stalking, witness intimidation, child abuse, violence, manipulation of federal law enforcement, and mental illness —while presenting such statements as established fact and grounded in her purported professional judgment. Defendant further invoked her claimed role as a mandated reporter and forensic psychiatrist to lend authority to these assertions, despite failing to undertake any reasonable investigation or verification of the extraordinary claims she published. The deliberate republication and amplification of these allegations in a public forum, including the decision to publish a private cease-and-desist letter containing such accusations, demonstrates a reckless disregard for the truth and supports a finding of actual malice.

261. As a direct and proximate result of Defendant's publication of the foregoing statements, including the public dissemination of the cease-and-desist letter, Plaintiff has suffered and continues to suffer substantial harm to his reputation, personal humiliation, and emotional distress. The statements at issue falsely accuse Plaintiff of serious misconduct, including stalking, harassment, witness intimidation, abuse, and dangerous mental instability, and therefore constitute defamation per se, entitling Plaintiff to presumed damages. Defendant's repetition and amplification of these accusations in a public forum has further exacerbated the harm to Plaintiff's personal and professional relationships and exposed him to public hatred, contempt, and ridicule. Plaintiff seeks all available damages, including general, special, and punitive damages, in an amount to be determined at trial.

**Publications Subsequent to Initial Filing**

**Defamatory Statements *written by Defendant* and published on October 25, 2025 on medium.com**

262. On October 25, 2025, Defendant authored and published an article on her Medium.com platform titled *"Each Should Grab Front-Page Headlines Every Day — But do Not because Judges Commit Them."* (Available at https://bandyxlee.medium.com/the-most-sickening-shocking-and-stomach-churning-crimes-happen-in-the-family-courts-bd173d6032d3).

263. In that publication, Defendant introduced and republished an article authored by Frank Parlato concerning Plaintiff.

264. In the article, Defendant purported to describe a case involving Plaintiff and his family, framing it as "one of the most heartbreaking cases I have witnessed," and asserting that "the beauty, the flourishing, and the utmost happiness of a loving mother and three children were simply taken away — and their lives crushed in a hellscape of nightmarish proportions."

265. Defendant attributed this outcome to Plaintiff, referring to him as an "abusive father" who had been "enabled and emboldened by years of impunity."

266. Defendant further asserted that Family Court actions involving Plaintiff resulted in "the Family Court's forced, total transmogrification of these children's and mother's lives," which she described as "utterly unnecessary and artificially-induced."

267. In describing the alleged consequences of Plaintiff's conduct, Defendant made extreme and inflammatory claims, stating that Family Courts, in cases such as this, operate as if "sending countless children to their rape, battery, sex trafficking, and actual murder if not soul murder were a legitimate judicial act."

268. Defendant explicitly tied these assertions to Plaintiff's case, stating that "in Family Court, the abusive father, so enabled and emboldened by years of impunity, launched [a lawsuit] against me."

269. Defendant presented these statements as clinical or expert conclusions and invoked her professional authority as a psychiatrist to lend credibility to the assertions concerning Plaintiff, despite the fact that she has never examined, interviewed, or even met Plaintiff.

270. The article included a captioned image referring to Plaintiff's daughter, stating: "A thriving, international gymnast before Family Court removed her from her loving mother, Mia Ambrose had grown morbidly obese and mutilated herself under her abusive father's 'care' — from which she is finally recovering after emancipation."

271. Defendant further directed readers to an additional publication concerning Plaintiff, stating: "The article below is not about how his goal of totally destroying his family was achieved — and magnified a hundredfold with the help of Family Court — but about his character pathology."

272. Defendant endorsed the accuracy of that additional publication in unequivocal terms, stating: "I attest to its factuality and flawless reporting."

273. Defendant republished in full the October 24, 2025 article titled *"The $405 Lie: How a Fallen TV Writer Exposed His Own Psychopathy."*

274. That article was written and published by Frank Parlato, Jr., a federal felon with whom Defendant frequently collaborates.

275. The article opened by asserting that Plaintiff was "unemployable but sitting on $2 million in marital assets."

276. The article further alleged that Plaintiff "weaponized a controversial legal theory — 'parental alienation' — to flip the script," and that he "documented ordinary family conflict, enlisted paid professionals, and built a case that his wife was turning the children against him."

277. The publication accused Plaintiff of manipulating judicial actors, alleging that his attorney and a court-appointed guardian "steered the case to Judge Jane Grossman — then seeking reappointment and known for separating mothers from children under the alienation doctrine."

278. The article described a court-ordered custody change as "the three children … removed from the home where they had lived with their mother their entire lives and sent to live with the father they feared."

279. The publication further asserted that Plaintiff financially exploited his former spouse, claiming that he "kept the marital assets and even seized her $150,000 inheritance," and that he "now lives in a $2.4 million beachfront home, while the mother … is homeless."

280. The article portrayed Plaintiff as abusive and controlling, alleging that he "pursued [the children], using restraining orders and police intervention to forcibly return them to his home," and that he "eventually outfit[ted] the home with locks, bars, cameras, and alarms to keep them from escaping."

281. The publication repeatedly characterized Plaintiff as dangerous, asserting that "the children repeatedly tried to escape to their mother," and that one child "finally … escaped at 17."

282. The article prominently featured and republished Defendant's own statements and purported "clinical assessment," including claims that Plaintiff presented "critical evidence of potential

danger to the children," and that his personality reflected "characteristics of psychopathic personality."

283. The article further quoted Defendant as asserting that Plaintiff's score on the Hare Psychopathy Checklist–Revised was "32," which was described as "strongly suggestive that a diagnosis of psychopathy is present and justified."

284. The publication attributed to Defendant statements that individuals like Plaintiff exhibit "pathological lying, a lack of empathy, a failure to accept responsibility, and poor behavioral controls," and may engage in a "manipulative and predatory relational style."

285. The article further quoted Defendant as stating that such individuals can "mislead, cheat, or otherwise violate the rights of other people," and may "recruit others as 'patrons' or 'pawns' to help them turn the narrative around to incriminating their victims instead."

286. The article also attributed to Defendant the assertion that "[s]eparating growing children from their mother and primary caregiver is one of the worst forms of abuse," and warned of Plaintiff's "potential … dangerousness, especially where children are involved.

287. Through Defendant's express endorsement and republication, the article conveyed that Plaintiff is a dangerous, abusive individual exhibiting psychopathy, who engages in deceit, manipulation, and coercive control, and who poses a threat to his own children.

288. Each of the foregoing statements is false and is contradicted by judicial findings, investigative records, and other objective evidence, as set forth herein.

289. At the conclusion of the article, Defendant used the publication to promote her own commercial and advocacy activities, stating: "On November 11, 2025, a landmark National

Press Club conference will take place to expose the national crisis of Family Court violence," and encouraging readers to "register here now."

290. Defendant's republication and endorsement of the article was part of a broader pattern of collaboration with Parlato in publishing and amplifying defamatory content concerning Plaintiff. Plaintiff has separately brought an action against Parlato in the United States District Court for the District of Connecticut arising from similar defamatory publications. See, *Ambrose v. Parlato* 3:25-cv-01151-SVN.

291. Defendant republished and endorsed the foregoing statements despite knowledge, or reckless disregard, of their falsity, including the absence of any legitimate clinical evaluation of Plaintiff and the existence of judicial findings and investigations that did not substantiate allegations of abuse.

292. The foregoing statements, as authored by Parlato and expressly adopted, endorsed, and republished by Defendant, falsely portray Plaintiff as, *inter alia*, a dishonest and disgraced professional, a manipulator of judicial processes, an abuser of his children, and an individual suffering from psychopathy who poses a danger to others, including minors. These statements further impute that Plaintiff engaged in deceitful, coercive, and predatory conduct, including the exploitation of legal proceedings for personal gain and the infliction of harm upon his own family. Such statements would naturally tend to subject Plaintiff to hatred, contempt, and ridicule, deter others from associating or dealing with him, and injure him in his personal and professional reputation. The statements constitute defamation per se, including by imputing criminal conduct, child abuse, moral depravity, and serious professional misconduct.

**Defamatory Statements *written by Defendant* and published on November 25, 2025 on medium.com**

293. On November 25, 2025, following the commencement of legal proceedings against her, Defendant authored and published an article on medium.com titled *THE HIDDEN EPIDEMIC OF FAMILY COURT VIOLENCE: KEYNOTE ADDRESS AND PANELS.* (The hyperlink below is "broken," but may be copied and pasted and will lead to the article: *https://bandyxlee.medium.com/major-national-conference-on-the-hidden-epidemic-of-family-court-violence-keynote-address-and-861e0a1aabf5.*

294. In the article, Defendant continued to publish and disseminate statements concerning Plaintiff as part of her broader narrative that Family Courts are "violent" and "dangerous," including statements specifically concerning Plaintiff and his daughter, Mia.

295. Referring to Plaintiff's daughter, Defendant wrote: "Ms. Mia Ambrose is 18 years old, newly emancipated and courageously speaking out after six years of silencing by the Connecticut Family Courts."

296. Defendant further stated that Mia had been "once thriving under her mother's care and internationally representing the U.S. as a young gymnast," but that "her life changed dramatically after a Family Court decision placed her with her abusive father."

297. Defendant expressly characterized Plaintiff as "her abusive father."

298. Defendant further published statements asserting that, while in Plaintiff's care, Mia was "isolated and struggling," and that she "descended into morbid obesity, depression, substance use, and self-harm."

299. Defendant continued by asserting that Mia "endured years of torment, until she turned 18 and regained her freedom."

300. Defendant further stated that Mia is now "reunited with her mother" and "thriving once again."

301. Defendant described Mia's statements as "her heartfelt testimony" regarding "unspeakable suffering through the Family Courts," and represented that her remarks "inspired a resounding, standing ovation."

302. Defendant also embedded and directed readers to a video of Mia delivering her remarks, stating: "Hear her brave, full testimony here," thereby republishing and further disseminating the statements contained therein.

303. Through the foregoing statements and the embedded video, Defendant conveyed that Plaintiff abused his daughter, caused her severe physical and psychological harm, and subjected her to prolonged suffering and "torment."

304. Defendant made and published these statements with actual knowledge of their falsity, or with reckless disregard for the truth, in the face of judicial findings and investigative determinations that affirmatively found no substantiation for any allegations of abuse against Plaintiff. Defendant further knew—and deliberately disregarded—that multiple courts had concluded that Mia had been coached by her mother—Defendant's client, Riordan—to make false allegations of abuse against Plaintiff.

305. The foregoing statements, as published by Defendant, falsely portray Plaintiff as an abusive parent who inflicted severe physical, emotional, and psychological harm upon his own child, including causing "morbid obesity, depression, substance use, and self-harm," and subjecting her to years of "torment." Such statements further convey that Plaintiff is dangerous to minors and unfit as a parent. These statements would naturally tend to subject Plaintiff to

hatred, contempt, and ridicule, deter others from associating or dealing with him, and injure him in his reputation as a parent and as a member of the community. The statements constitute defamation per se, including by imputing child abuse, moral depravity, and serious misconduct.

**Defamatory Statements *written by Defendant* and published on November 29, 2025 on Substack.com**

306. On November 29, 2025, Defendant authored and published an article on her "Family Court Violence" Substack platform titled *MAJOR NATIONAL CONFERENCE ON THE HIDDEN EPIDEMIC OF FAMILY COURT VIOLENCE: MS. MIA AMBROSE'S TESTIMONY.* (The hyperlink below is "broken," but may be copied and pasted and will lead to the article: https://familycourtviolence.substack.com/p/major-national-conference-on-the-cf8

307. Defendant further promoted the speech on her X account and provided links to it in YouTube and medium.com.

308. In the article, Defendant introduced and endorsed statements concerning Plaintiff made by his daughter, Mia Ambrose, and republished her speech, presenting it as truthful and authoritative.

309. Defendant framed the speech by stating that Mia was "courageously speaking out after six years of silencing by the Connecticut Family Courts," and asserted that her life changed after being placed with "her abusive father."

310. Defendant expressly characterized Plaintiff as "her abusive father."

311. Defendant further asserted that, while in Plaintiff's care, Mia "descended into morbid obesity, depression, substance use, and self-harm," and "endured years of torment."

312. Defendant then directed readers to "hear her brave, full testimony," and republished extensive excerpts of that testimony.

313. In the republished statements, Defendant disseminated claims that Plaintiff exercised "total control and isolation," that the children were "cut off from [their] mother," and that Plaintiff "rewrote" their history.

314. Defendant further republished statements asserting that "every sign of abuse was dismissed," and that Plaintiff's conduct caused the children to become "depressed, anxious, suicidal, and withdrawn," and to engage in "self-harming" behavior.

315. Defendant also republished statements alleging that the children "reported sexual abuse," and that a "forensic investigation confirmed [the children] were victims and that all three … were unsafe in [Plaintiff's] home."

316. Defendant republished statements asserting that Plaintiff subjected the children to punishment, isolation, confiscation of communication devices, and intensified "abuse and surveillance."

317. Defendant further republished statements describing Plaintiff as an "abuser," asserting that Mia "fled his home," and portraying Plaintiff as a continuing threat to his children.

318. Through the foregoing publication and republication of these statements, Defendant conveyed that Plaintiff committed acts of abuse, including severe physical, emotional, and sexual abuse, and engaged in coercive and controlling conduct toward his children.

319. Defendant published and endorsed these statements despite knowledge, or in reckless disregard, of contrary findings from multiple police and DCF investigations, as well as

judicial determinations in multiple courts, which did not substantiate allegations of abuse against Plaintiff.

320. Defendant further knew—and deliberately disregarded—that courts had determined that Mia had been coached by her mother—Defendant's client, Riordan—to make false allegations of abuse against Plaintiff.

321. Defendant's republication and endorsement of these statements occurred after the commencement of legal proceedings against her, and formed part of a continuing pattern of amplifying and republishing defamatory allegations concerning Plaintiff.

322. The foregoing statements, as published and republished by Defendant, falsely portray Plaintiff as an abusive parent who engaged in severe physical, emotional, and sexual abuse of his children, exercised coercive control, and caused profound psychological harm. Such statements would naturally tend to subject Plaintiff to hatred, contempt, and ridicule, deter others from associating or dealing with him, and injure him in his reputation as a parent and member of the community. The statements constitute defamation per se, including by imputing child abuse, sexual misconduct, and moral depravity.

## REPUBLICATION AND AMPLIFICATION ARTICLES

323. In addition to the principal defamatory publications set forth above, Defendant engaged in a sustained and calculated campaign to amplify her falsehoods through third-party media outlets, primarily those controlled by convicted felons Frank Parlato, Jr. and Richard Luthmann, both close associates of Riordan, Plaintiff's former spouse, who hired Defendant Lee.

324. Defendant directly provided these outlets with—and encouraged the republication of— highly prejudicial and false materials, including her Riordan Letter, O'Neill Letter, her deceptive DCF Report, her unsubstantiated "diagnostic psychopathy evaluation" in the Hare Psychopath Checklist, and her professional credentials.

325. Beyond providing documents, Defendant actively participated in interviews and podcasts with these third-party outlets to orally disseminate and affirm these falsehoods. By feeding these documents to third-party authors and appearing personally to amplify them, Defendant intentionally ensured her defamatory content reached a wider audience, cloaked her lies in a false veneer of institutional authority, and caused compounding reputational and emotional harm to Plaintiff.

326. The list below is not exhaustive; Plaintiff reserves the right to amend this Complaint or introduce further evidence of additional republications discovered during the course of litigation.

**Defamatory Statements published on July 20, 2023 on <u>frankreport.com</u> (two articles)**

327. On July 20, 2023, Defendant made statements concerning Plaintiff that were published in articles on frankreport.com, titled *The Great Escape: Ambrose's Kids Leave His Home Cite Abuse; Ambrose Seeks Mother's Arrest* (available at: https://frankreport.com/2023/07/20/part-1-the-great-escape-ambroses-kids-leave-his-home-cite-abuse-ambrose-seeks-mothers-arrest/ and *Innocence Lost in Father's House of Fear: Mia Speaks Out Against Chris Ambrose* (available at: https://frankreport.com/2023/07/20/innocence-lost-in-fathers-house-of-fear-mia-speaks-out-against-chris-ambrose/).

328. In these publications, Defendant falsely attributed abusive conduct to Plaintiff. For instance, she is quoted as saying: "Separating growing children from their mother and primary caregiver is one of the worst forms of abuse, which can have lifelong ramifications..." Despite her knowledge that custody and visitation were governed by court orders rather than Plaintiff's actions, Defendant disseminated these falsehoods to a public audience, inciting hostile commentary and causing actual reputational harm.

**Defamatory Statements published on August 5, 2023 on frankreport.com**

329. On August 5, 2023, Defendant made additional statements concerning Plaintiff in an article published on frankreport.com titled *Ambrose's Attorney Withdraws, as National Media Outlet Looks at Ambrose CT Custody Case*.(available at: https://frankreport.com/2023/08/05/ambroses-attorney-withdraws-as-national-media-outlet-looks-at-ambrose-ct-custody-case/).

330. In this publication, Defendant acted as the primary psychiatric and factual authority, falsely identifying Plaintiff as a "psychopath" with a "dangerously high" score of 32 on the Hare Psychopathy Checklist. To facilitate this ongoing dissemination, Defendant provided and encouraged the republication of her May 3, 2023 Riordan Letter, her deceptive DCF Report, the Hare Psychopathy Checklist, and her own credentials. This article identified Plaintiff and his minor children by name and photograph in connection with false allegations of sexual abuse, inciting hostile public commentary and causing documented reputational harm.

**Defamatory Statements published on August 9, 2023 on frankreport.com**

331. On August 9, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article on frankreport.com titled *Why Was 'Rookie' CT Judge Called in to Make Significant Jennifer's Law Distortion? Judge O'Neill Took Three Teens From Mother Against Their Wishes* (available at: https://frankreport.com/2023/08/09/why-was-rookie-judge-called-in-to-make-significant-jennifers-law-distortion-judge-oneill-took-three-teens-from-mother-against-their-wishes/).

332. Utilizing her medical credentials to present her claims as an authoritative clinical diagnosis, Defendant asserted that Plaintiff was "likely psychopathic." She further facilitated the dissemination of this narrative by supplying the outlet with her Riordan Letter, DCF Report, Hare Psychopathy Checklist, and her professional qualifications. These materials, and the statements therein, would be understood by a reasonable reader to mean that Plaintiff is a dangerous, sexually, and emotionally abusive parent who poses a threat to his children and society. By leaking these confidential documents to a public blog, Defendant ensured Plaintiff would be exposed to public hatred and ridicule, causing demonstrable reputational and emotional injury.

**Defamatory Statements published on August 13, 2023 on substack.com**

333. On August 13, 2023, Defendant's statements concerning Plaintiff were further published and disseminated in an article on substack.com titled, *Connecticut Court 'Cash For Kids' Scheme Services Pedophiles?* (available at: https://luthmann.substack.com/p/connecticut-court-cash-for-kids-scheme).

334. This article, authored by Defendant's frequent collaborator Richard Luthmann, presented Defendant as a noted expert while quoting her description of Plaintiff as a "violent abuser" and a "psychopath." Notably, the publication included the full text of Defendant's O'Neill Letter—an unsolicited correspondence rejected by the Court and not part of the public record —which Defendant provided to Luthmann for extrajudicial dissemination. By leaking this rejected letter and her previously authored reports (including the DCF Report and Riordan Letter), Defendant ensured the public dissemination of false allegations regarding sexual abuse, embezzlement, and professional misconduct. This article was republished by Luthmann again on August 13, 2024, illustrating the ongoing and cumulative reputational harm caused by Defendant's intentional orchestration of these publications.

**Defamatory Statements published on August 17, 2023 on <u>frankreport.com</u>**

335. On August 17, 2023, Defendant's statements concerning Plaintiff were again disseminated in an article written by Defendant's frequent collaborator Luthmann and published on frankreport.com titled *Ashley Deckert Director of Rhode Island Department of Children Youth and Families Responds to Concerns About Ambrose Children*. (The hyperlink immediately below is "broken," but may be copied and pasted and will lead to the article: https://frankreport.com/2023/08/17/ashley-deckert-director-of-rhode-island-department-of-children-youth-families-responds-to-concerns-about-ambrose-children/).

336. In this publication, Defendant leveraged her "MD" and "MDiv" credentials to issue a "warning" of Plaintiff's "dangerousness where his children are involved." By framing this as a professional medical warning, Defendant communicated a provably false factual

conclusion that Plaintiff poses a physical or psychological threat. Defendant further facilitated this targeted attack by supplying the outlet with her previously authored Riordan Letter, DCF Report, Psychopathy Checklist, and professional credentials, which were then disseminated to an audience that included public officials and child protective services. This calculated attempt to poison Plaintiff's reputation with law enforcement and child welfare agencies caused immediate and severe reputational injury, as evidenced by the hostile public reaction.

**Defamatory Statements published on September 3, 2023 on frankreport.com**

337. On September 3, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article published on frankreport.com by Defendant's frequent collaborator Luthmann titled *Luthmann: Kids Can Be Sold to Anyone, If the Buyer Has Money in Family Court in Gov. Lamont's CT* (available at: https://frankreport.com/2023/09/03/luthmann-kids-can-be-sold-to-anyone-if-the-buyer-has-money-in-family-court-in-gov-lamonts-ct/).

338. In this publication, Defendant's statements were again presented as credible clinical assessments. She is quoted as stating: "This potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked." By framing this as an urgent warning that "should not be overlooked," and by referring to Plaintiff as a "psychopath" and the children's "abuser," Defendant presented her claims as authoritative findings. To ensure the "clinical" weight of these labels, Defendant again facilitated the republication of her previously supplied reports and checklists. This repeated and ongoing

dissemination to a public audience continued to incite hostile commentary and compounded the actual reputational harm caused by Defendant's coordinated actions.

**Defamatory Statements published on September 13, 2023 on frankreport.com**

339. On September 13, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article on frankreport.com titled *Money Talks in Family Court: How Christopher Ambrose Bought His Kids and Their Futures – And Turned Maternal Love into a Liability* (available at: https://frankreport.com/2023/09/13/money-talks-in-family-court-how-christopher-ambrose-bought-his-kids-and-their-futures-and-turned-maternal-love-into-a-liability/).

340. In this publication, Defendant's representations were again used to present the clinical conclusion that Plaintiff "is a dangerous psychopath." By attributing this "belief" to her professional title and medical credentials, Defendant communicated a provably false assertion regarding a dangerous pathological condition. The harm of these "expert" labels was amplified by the article's headline and context, which falsely accused Plaintiff of "buying" his children. To further the appearance of authority, Defendant facilitated the republication of her supplied Riordan Letter, DCF Report, Hare Psychopathy Checklist, and professional qualifications. This coordinated dissemination placed Plaintiff in a false light and exposed him to public contempt by framing his parental status as a product of criminal and moral corruption.

**Defamatory Statements published on September 25, 2023 on frankreport.com (First Article)**

341. On September 25, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article on frankreport.com titled *Family Court Gave the Kids to a Psychopath? Chris Ambrose Scores 32 on Psychopathy Psychopath Checklist* (Available here: https://frankreport.com/2023/09/25/family-court-gave-the-kids-to-a-psychopath-chris-ambrose-scores-32-on-psychopathy-checklist/).

342. In this publication, the headline itself utilized a numerical score purportedly generated by Defendant to brand Plaintiff a "psychopath" in a sensationalized and conclusive manner. Defendant leveraged misrepresentations of her credentials—including false claims of faculty status at Yale and Harvard—to imbue her "clinical" findings with unearned authority. By providing the "Hare Psychopathy Checklist–Revised (PCL-R)" to a public blog, Defendant presented a specific numerical score of 32 as a verifiable finding of fact that Plaintiff is a "medically diagnosed psychopath" whose condition "contraindicates parenting." In reality, Defendant abandoned all professional standards by performing this "assessment" without ever meeting or evaluating Plaintiff. This reckless fabrication was designed to provide a "scientific" veneer to her malicious claims that Plaintiff was "hunting" his children and posed a "dangerousness" that should not be overlooked. The publication further identified Plaintiff's minor children by name and included their images in connection with false allegations of sexual abuse, subjecting the family to public hatred and endangering their safety.

**Defamatory Statements published on September 25, 2023 on frankreport.com (Second Article)**

343. On September 25, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in a second article on frankreport.com titled *The Escape Continues: Teens Run, Seek 4th Sanctuary from Ambrose's Grip.* (While this hyperlink is broken, the article remains online and available by copying and pasting this link: https://frankreport.com/2023/09/25/the-escape-continues-teens-run-seek-4th-sanctuary-from-ambroses-grip/).

344. In this publication, Defendant is portrayed as a "prominent figure in forensic psychiatry" who had "closely examined" Plaintiff—a provably false claim designed to give her labels the weight of a legitimate medical diagnosis. Defendant used this platform to disseminate horrific and fabricated allegations, including claims that she heard recordings of Plaintiff threatening his daughter with "vaginal penetration" and that his son had "reported anal penetration." Notably, Defendant has never produced these purported recordings to law enforcement, choosing instead to "leak" the descriptions to a public blog. To further the harm, Defendant provided the outlet with her confidential DCF Report, bypassing official legal channels and waiving any claim of privilege through this extrajudicial act. By publicly identifying Plaintiff's minor children as victims of sexual abuse and including their images, Defendant ensured maximum reputational damage and extreme emotional distress.

**Defamatory Statements *written by Defendant Lee* and published on October 7, 2023 on medium.com**

345. On October 7, 2023, Defendant wrote and published statements concerning Plaintiff in an article on her "Bandy X. Lee" medium.com page titled *An "Alternative Court" of Unspeakable Criminality, Violence, and Abuse*

346.. Available here: https://bandyxlee.medium.com/an-alternative-court-of-unspeakable-criminality-violence-and-abuse-75c6244f71fc (The article was removed after Plaintiff sent Defendant a Cease and Desist Letter on October 17, 2023,).

347. In this publication, Defendant used her own platform to disseminate abuse allegations to a global audience. Notably, upon removing the article in response to Plaintiff's Cease and Desist Letter, Defendant replaced it with a statement specifically referring to Plaintiff as a "dangerous perpetrator." By publishing this succinct defamatory epithet after being placed on actual notice of the falsity of her claims, Defendant demonstrated a reckless disregard for the truth and a malicious intent to continue harming Plaintiff's reputation. The use of a high-traffic platform like Medium ensured these defamatory labels were indexed by search engines, causing immediate and ongoing reputational damage.

**Defamatory Statements published on October 10, 2023 on frankreport.com**

348. On October 10, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article on frankreport.com titled *Ambrose Case Sparks Alarm in Rockland County – Authorities Launch Investigation* (available at: https://frankreport.com/2023/10/10/ambrose-case-sparks-alarm-in-rockland-county-authorities-launch-investigation/).

349. In this publication, Defendant used her professional title to validate a demonstrably false claim: that she had "obtained" recordings of Plaintiff using "sexually explicit language" to threaten and intimidate his daughter. On information and belief, Defendant specifically represented to the publisher that she possessed such evidence, yet she has never produced these purported recordings to law enforcement, child protective services, or any court. By

fabricating the existence of incriminating evidence to a public blog, Defendant engaged in a reckless and malicious attempt to validate attacks on Plaintiff's reputation. The article further identified Plaintiff's minor children by name and age, including their images in connection with these false allegations, causing ongoing and measurable harm as the public continues to cite Defendant's credentials to justify their hostility toward Plaintiff.

**Defamatory Statements published on October 23, 2023 on frankreport.com**

350. On October 23, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article on frankreport.com titled *"Family Court Mastery Secures Ambrose's Return of His Teenagers Amidst Abuse Claims."* (available at: https://frankreport.com/2023/10/23/ambroses-legal-mastery-secures-return-of-his-teenagers-amidst-abuse-claims/).

351. In this publication, Defendant leveraged her psychiatric authority to falsely characterize Plaintiff's formal legal Cease and Desist notice as "threats and intimidation" by a "dangerous perpetrator." Defendant doubled down on her fabricated clinical findings, asserting that Plaintiff's purported score of 32 on the PCL-R is a "contraindication to parenting." Most egregiously, Defendant asserted a professional comparison, stating: "I have met individuals more dangerous than Christopher Ambrose in my clinical work. Every single one of them is currently housed in a maximum-security institution." By equating Plaintiff to maximum-security criminals and branding him "extremely dangerous" without ever meeting or evaluating him, Defendant abandoned all professional standards to incite public hatred. The article further identified Plaintiff's minor children by name and included images of the

family in connection with false sexual abuse allegations, causing targeted and ongoing reputational injury.

**Defamatory statements published on December 15, 2023 on frankreport.com**

352.On December 15, 2023, Defendant's statements concerning Plaintiff were again published and disseminated in an article on frankreport.com titled *Nusbaum's Actions Under the Microscope in Ambrose Riordan Case* (available at: https://frankreport.com/2023/12/15/nusbaums-actions-under-microscope-in-ambrose-riordan-case/).

353.In this publication, Defendant's representations were again used to present the authoritative clinical assessment that Plaintiff is "potentially psychopathic." To maximize the impact of this narrative, the publication embedded a direct link to Defendant's prior, extensive defamatory article from October 2023, thereby intentionally republishing and recirculating her previous false claims to a wide audience. This targeted effort to keep the defamatory narrative alive in the public eye further injured Plaintiff's personal and professional reputation and continued to incite hostile community commentary.

**Defamatory statements published on January 17, 2024 on substack.com**

354.On January 17, 2024, Defendant's statements concerning Plaintiff were published and disseminated by Defendant's frequent collaborator, convicted federal felon Richard Luthmann, in an article on substack.com titled *The Tragic Tale of Jennifer Dulos and the Connecticut Law That Bears Her Name* (available at: https://luthmann.substack.com/p/the-tragic-tale-of-jennifer-dulos).

355. In this publication, Defendant was again presented as a "prominent American psychiatrist" whose "diagnosis" of Plaintiff as "psychopathic" was based on a Hare Psychopathy Checklist she performed without ever meeting him. The article used Defendant's provided statements to accuse Plaintiff of "sexual abuse," "witness intimidation," and "victim reversal," while republishing her claim to have "heard recordings" of threats of "vaginal penetration." Notably, Defendant "confirmed" these allegations as established facts at a time when the children had already returned to Plaintiff's care and withdrawn their legal petitions. Despite these clear judicial and factual developments, Defendant continued to leverage her credentials to disseminate these debunked claims and confidential reports (including the O'Neill Letter and DCF Report) to a global audience, directly inciting hostile public commentary that cited her "expert findings" to justify attacks on Plaintiff.

**Defamatory Statements published on October 25, 2024 on substack.com**

356. On October 25, 2024, Defendant's statements concerning Plaintiff were published and disseminated in an article by Defendant's frequent collaborator, Richard Luthmann on substack.com titled *"Chilling Endorsement: Psychopath Backs 'Dead Duck' Divorce Strategy"* (available at: https://luthmann.substack.com/p/dead-duck-divorce-strategy-allan).

357. In this publication, Defendant's representations were used to assert that she had "diagnosed" Plaintiff with a psychopathy score "higher than some serial killers." By presenting this extreme and unfounded comparison as a forensic psychiatric finding, Defendant communicated a provably false assertion of dangerousness and criminal pathology. The article further relied on Defendant's professional status to validate the republication of her O'Neill Letter and DCF Report—containing allegations of sexual abuse and extreme

misconduct—as "unequivocal" support for the defamatory narrative. Despite having never met or evaluated Plaintiff, and with reckless disregard for judicial findings to the contrary, Defendant facilitated the public dissemination of these confidential materials to high-traffic platforms, causing targeted and severe injury to Plaintiff's reputation as a parent and community member.

**Defamatory Statements published on November 7, 2024 on <u>substack.com</u>**

358. On November 7, 2024, statements originating from and attributable to Defendant concerning Plaintiff were written, published and disseminated by Defendant's frequent collaborator Richard Luthmann in an article on substack.com titled *CT Judge's Misogyny Shines as He Twists Jennifer's Law to Favor Alleged Abuser Christopher Ambrose.*(available at: [https://luthmann.substack.com/p/ct-judges-misogyny-shines-as-he-twists](https://luthmann.substack.com/p/ct-judges-misogyny-shines-as-he-twists)).

359. In this publication, Defendant introduced a malicious fabrication, stating: "Ambrose lied to federal agents, leading to a SWAT team raid." No such event ever occurred. By inventing a SWAT response and alleging Plaintiff lied to federal agents, Defendant imputed criminal conduct and serious moral turpitude, constituting Defamation *Per Se*. The article further relied on Defendant's "clinical assessment"—conducted without a single interview—to label Plaintiff with "psychopathy" and "DARVO" tactics. To maximize the reach of these lies, Defendant facilitated the display of screenshots of her "O'Neill Letter" and DCF report, while embedding links to years of her prior defamatory articles. This coordinated effort on a high-traffic platform like NewsBreak demonstrates a willful intent to cause Plaintiff severe reputational and legal harm through the dissemination of debunked and fabricated narratives.

**Defamatory Statements published on February 22, 2026 on <u>newsbreak.com</u>**

360. On February 22, 2026—after the commencement of this action—statements originating from and attributable to Defendant were republished and further disseminated in an article on newsbreak.com titled *Enabling Pedo Empires? Rotten Apple and Rancid Nutmeg,* authored by Defendant's frequent collaborator, felon Richard Luthmann and Michael Volpe. Available here: https://www.newsbreak.com/luthmann-news-this-is-for-real--347942861/4506135002337-enabling-pedo-empires-rotten-apple-and-rancid-nutmeg

361. Published after the initiation of this lawsuit, this article relies on Defendant's provided materials to falsely assert that she "evaluated the Ambrose family" and "administered the gold-standard psychopath test." The publication attributes to Defendant the "full diagnosis" that Plaintiff is a "profoundly dangerous" psychopath, and further disseminates sadistic fabrications—including claims that Plaintiff killed the family dog and pet crabs to traumatize his children. By continuing to facilitate the republication of her debunked reports and clinical labels on high-traffic platforms like NewsBreak after being placed on formal notice of their falsity, Defendant has demonstrated actual malice and a deliberate, ongoing intent to destroy Plaintiff's reputation through the imputation of animal cruelty, child abuse, and severe psychological pathology.

**Defendant Lee's Course of Conduct**

362. The foregoing publications are not isolated incidents but constitute a sustained and coordinated pattern of publication, endorsement, and amplification by Defendant designed to defame Plaintiff.

363. Beginning with her initial publications, Defendant repeatedly authored, endorsed, and republished statements falsely accusing Plaintiff of criminal conduct—including child sexual abuse—dangerousness, and severe psychological pathology.

364. Defendant amplified these accusations across multiple platforms—including her own websites, content publishing platforms like Substack and Medium, and social media outlets like X—as well as through direct coordination with frequent collaborators, convicted felons Richard Luthmann and Frank Parlato.

365. These collaborators further disseminated Defendant's statements and materials to their own audiences, exponentially increasing the scope of the harm caused to Plaintiff.

366. Defendant further expanded the reach of these statements by incorporating them into public-facing advocacy efforts, including podcasts and a nationally promoted conference featuring Plaintiff's daughter.

367. Defendant also republished and endorsed third-party content, which she expressly vouched for as "factual" and "flawless."

368. Even after the commencement of this action—when Defendant was on clear notice of the falsity of her statements—she continued to disseminate and amplify the same allegations, including through publications as recent as February 2026.

369. This sustained campaign of continuous publication in the face of contrary judicial findings, investigative determinations, and direct notice of falsity evidences actual malice, including both knowledge of falsity and reckless disregard for the truth

370. Defendant's conduct further demonstrates a deliberate intent to maximize reputational harm to Plaintiff.

**Status of Plaintiff and Nature of Defendant Lee's Statements**

371. Plaintiff is a private individual who has never sought or obtained public notoriety. He has not voluntarily injected himself into any public controversy nor assumed any role of special prominence in any public debate.

372. Plaintiff has never publicly posted online or otherwise commented to the public or the media regarding his ex-wife, their children, Defendant, or the details of their family or any underlying court proceedings.

373. At all relevant times, Plaintiff was a private citizen involved in domestic court proceedings. These proceedings arose from private family circumstances involving minor children and do not constitute matters of public participation or voluntary public disclosure by Plaintiff.

374. The existence of any public discussion or online commentary regarding Plaintiff is not the result of his own actions, but rather the result of a coordinated and intentional campaign initiated and sustained by Plaintiff's ex-wife Riordan, working in concert with Defendant, whom she retained, and other third parties—including, but not limited to, her close associates Frank Parlato, Jr., Richard Luthmann, and Paul Boyne, all three convicted felons with documented histories of criminal conduct involving dishonesty. Plaintiff remains a private figure who has been thrust into a public forum involuntarily by the tortious conduct of Defendant and her collaborators.

375. Defendant's statements concerning Plaintiff were not framed as subjective opinions, speculation, or rhetorical commentary, but as assertions of fact and purported professional conclusions grounded in claimed expertise and evidence.

376. Defendant repeatedly represented to the public that she had formed specific clinical and forensic conclusions regarding Plaintiff—including false allegations of serious criminal conduct like child sexual abuse, and diagnosable mental health conditions—despite never having examined, interviewed, or even met him.

377. At no time did Defendant examine, interview, or otherwise assess Plaintiff in any accepted professional capacity, nor did she ever even speak with him. Yet, Defendant falsely represented that her defamatory statements were grounded in professional expertise and clinical judgment, thereby lending them an appearance of objective reliability and authority.

378. These statements would be understood by a reasonable reader as conveying verifiable facts about Plaintiff, rather than protected expressions of pure opinion.

379. To the extent Defendant's statements were framed in the language of opinion, they nonetheless implied the existence of undisclosed defamatory facts and were presented as authoritative findings.

380. Defendant's statements are therefore actionable because they assert or imply provably false facts about Plaintiff that are capable of objective verification and disproof.

**Falsity and Disregard for Truth**

381. Defendant's statements concerning Plaintiff are false. At all relevant times, Plaintiff has denied the allegations of abuse and misconduct published by Defendant.

382. Prior to and during her publications, Defendant was aware of, or deliberately disregarded, substantial contradictory information arising from judicial proceedings and official investigations.

383. Defendant failed to undertake reasonable steps to verify the accuracy of her statements. She did not contact Plaintiff and refused to accept readily available information—including multiple judicial decisions contradicting her claims—even though she acknowledged in sworn testimony that Plaintiff had directly provided this information to her and she had reviewed it.

384. Instead of relying on objectively verifiable public records and judicial determinations, Defendant relied exclusively on inherently biased and interested sources aligned with Plaintiff's litigation adversaries.

385. Defendant published statements concerning Plaintiff in a manner that conveyed certainty as to serious allegations, including criminal conduct and diagnosable mental health conditions, while lacking any reliable factual or methodological basis for such conclusions.

**Actual Malice**

386. Defendant published the foregoing statements concerning Plaintiff with actual malice, that is, with knowledge of their falsity or with reckless disregard for whether they were true or false.

387. Defendant had access to, and was aware of, substantial information contradicting the allegations she published, including judicial findings and investigative determinations that did not substantiate claims of abuse and misconduct against Plaintiff. Plaintiff directly provided Defendant with these judicial findings, yet Defendant deliberately disregarded this objective evidence and failed to undertake reasonable steps to verify her statements.

388. Defendant instead relied exclusively on biased and interested sources—including her own client (Riordan) and Plaintiff's minor daughter—while ignoring the readily available public records and judicial decisions that contradicted them.

389. Defendant presented her statements as authoritative clinical and forensic findings—including assertions that Plaintiff was a "psychopath" and dangerous—despite never having examined, interviewed, or met Plaintiff, and without any reliable factual or methodological basis for such conclusions.

390. Defendant further acted with actual malice by republishing and endorsing third-party statements she expressly vouched for as "factual" and "flawless," without independently verifying their accuracy.

391. Defendant's continued publication and amplification of the same allegations after the commencement of this action, when she was on notice of their falsity, further evidences her knowledge of falsity and reckless disregard for the truth.

392. Defendant's conduct, taken as a whole, demonstrates a conscious disregard for the truth and a deliberate intent to injure Plaintiff's reputation.

**Republication and Attribution of Statements**

393. Defendant is liable not only for statements she directly authored and published, but also for statements she made that were republished by third parties. At all relevant times, Defendant made statements concerning Plaintiff with the expectation and intent that they would be further disseminated to a broader audience, including through media outlets with which Defendant knowingly engaged.

394. Defendant's statements were in fact republished in various media outlets, including articles and online publications in which Defendant was quoted, cited, or relied upon as an expert source. In each instance, Defendant is responsible for the defamatory content she originated and supplied for republication.

395. Defendant also appeared on podcasts hosted by her frequent collaborator Richard Luthmann, during which she made statements concerning Plaintiff with the expectation and intent that such statements would be recorded, published, and widely disseminated, further amplifying the defamatory content and compounding the harm to Plaintiff.

396. Defendant further caused the widespread dissemination of materials she had prepared or submitted in purportedly protected contexts—including communications directed to courts and child protective authorities—by publishing those materials herself and providing them to third parties for republication.

397. For example, Defendant authored and transmitted the Riordan Letter, O'Neill Letter and related materials, including her purported psychopathy evaluation of Plaintiff. Although the

court declined to accept Defendant as an expert and refused to consider the submission, Defendant thereafter published the O'Neill Letter and the Hare Psychopathy Checklist scoring and provided them to third parties for further dissemination.

398. Similarly, Defendant prepared and submitted a report to the DCF containing allegations that Plaintiff sexually abused his children. Defendant subsequently published that report and its contents, and shared it with third parties for republication.

399. By voluntarily disclosing and disseminating these materials beyond any purportedly privileged or confidential context, and by providing them to third parties for further public distribution, Defendant waived any claim of privilege that might otherwise have attached and is liable for the foreseeable republication of the defamatory statements contained therein.

**Damages**

400. As a direct and proximate result of Defendant's false and defamatory statements, Plaintiff has suffered, and continues to suffer, substantial harm to his reputation, standing in the community, and personal and professional relationships.

401. Defendant's statements accuse Plaintiff of, *inter alia*, child sexual abuse, stalking, coercive control, and severe psychological pathology, including psychopathy. Such statements constitute defamation *per se* and are inherently damaging to Plaintiff's reputation, entitling him to presumed damages under applicable law.

402. The widespread dissemination and promotion of Defendant's statements across multiple platforms—including websites, social media, online publications, podcasts, and public

advocacy events—has significantly amplified the harm, exposing Plaintiff to a broad audience and causing enduring reputational injury.

403. As a result of Defendant's conduct, Plaintiff has suffered humiliation, emotional distress, and mental anguish, and has been subjected to public hatred, contempt, and ridicule.

404. Defendant's continued publication and republication of defamatory statements after the commencement of this action has exacerbated Plaintiff's damages and demonstrates a conscious disregard for the harm caused.

405. Defendant's conduct was willful, wanton, and undertaken with actual malice, thereby entitling Plaintiff to punitive damages to the fullest extent permitted by law.

## COUNT I – INVASION OF PRIVACY BY FALSE LIGHT

406. Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein, including, without limitation, the sections titled "Falsity and Disregard for Truth," "Actual Malice," and "Republication and Attribution of Statements."

407. Under Connecticut law, a claim for invasion of privacy by false light requires that (a) the defendant publicized information that placed the plaintiff in a false light that would be highly offensive to a reasonable person, and (b) the defendant knew of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.

408. Defendant publicized numerous false, misleading, and highly damaging statements concerning Plaintiff, including but not limited to statements made in articles, interviews, purported reports to courts and governmental agencies, alleged diagnostic materials,

correspondence, and other publications described in this Complaint (collectively, the "Publications").

409. Through these Publications, Defendant portrayed Plaintiff as, among other things, a dangerous psychopath, a perpetrator of sexual abuse against his children, a manipulator of courts and law enforcement, and an individual engaged in criminal and predatory conduct.

410. These portrayals were false and placed Plaintiff in a highly offensive and misleading light that would be objectionable to a reasonable person.

411. Defendant acted with actual malice, in that she knew her statements were false or acted with reckless disregard for their truth or falsity. As alleged herein, Defendant was aware of extensive contrary information, including judicial findings, investigative determinations, and other objective evidence, yet deliberately disregarded that information and republished the allegations repeatedly, including after the commencement of this action, and did so under the guise of professional clinical authority while knowingly omitting the fact that she had never examined the subject of her assessments.

412. Defendant's Publications exposed Plaintiff to public hatred, contempt, ridicule, and disgrace; created a false and damaging impression of his character, conduct, and fitness as a parent and member of the community; and caused Plaintiff to suffer extreme mental anguish, emotional distress, and a profound invasion of his personal peace.

413. Defendant disseminated these Publications widely through the internet, social media, podcasts, and third-party platforms, making them accessible to audiences within Connecticut

and throughout the United States, and did so with the expectation and intent that such statements would be further republished and amplified.

414. Plaintiff is a private individual and not a public official or public figure.

415. Defendant's conduct was not isolated, but part of a sustained and ongoing course of publication and republication of false and misleading statements from at least July 2023 through the present, as set forth in detail above.

416. Defendant is further liable for the republication of her statements by third parties because she supplied and disseminated the underlying allegations, materials, and purported expert findings with the expectation and intent that they would be further published.

417. To the extent Defendant may contend that any of her statements or materials were subject to privilege based on their submission in judicial or quasi-judicial contexts, such protection does not apply here. Defendant voluntarily published and disseminated those materials—including, *inter alia,* the O'Neill Letter, the Riordan Letter, her purported Hare psychopathy evaluation, and her report to the Connecticut DCF—outside any protected proceeding and provided them to third parties for further publication, thereby waiving any such privilege.

418. By republishing and distributing these materials beyond any purportedly confidential or protected setting, and by affirmatively supplying them to others for widespread dissemination, Defendant is responsible for the foreseeable republication of the defamatory statements contained therein.

419. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer substantial and irreparable harm. This harm includes, but is not limited to:

- Severe emotional distress, mental anguish, and humiliation resulting from the public portrayal of Plaintiff as a criminal and a child abuser;

- Significant damage to his personal and professional reputation within his community and his profession; and

- Practical and personal disruption, including being forced to address and explain the false and offensive allegations to third parties, including neighbors, school officials, and professional associates, in an effort to mitigate the damage caused by Defendant's widely disseminated publications.

420. The nature of Defendant's accusations—particularly allegations of child abuse, sexual misconduct, and psychopathy—strike at the core of Plaintiff's identity as a parent and member of the community and are inherently and profoundly damaging.

## COUNT II – DEFAMATION *PER SE*

421. Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein, including, without limitation, the sections titled "Falsity and Disregard for Truth," "Actual Malice," and "Republication and Attribution of Statements."

422. Under Connecticut law, a statement constitutes defamation per se where its defamatory meaning is apparent on its face and is of a kind that the law presumes to cause injury to reputation, without the need to prove special damages.

423. Statements that are defamatory per se include, among others, false statements that (a) accuse a person of committing a crime involving moral turpitude, (b) accuse a person of conduct punishable by imprisonment, or (c) injure a person in his profession or business.

424. Defendant published numerous false statements concerning Plaintiff that constitute defamation per se, including but not limited to statements falsely accusing him of:

- Committing sexual abuse against his children, including allegations of rape and other sexual misconduct;

- Engaging in emotional, psychological, and verbal abuse of his children and their mother;

- Stalking, threatening, and "hunting" his children and others;

- Facilitating or permitting criminal conduct involving minors, including substance use and sexual misconduct;

- Committing financial crimes, including embezzlement and theft;

- Engaging in professional misconduct, including false statements that Plaintiff "lost his law license" and was "fired for fraud," which are demonstrably false. Plaintiff has not lost his law license, nor was he terminated from any employment for fraud. Defendant published these

specific, objective falsehoods with reckless disregard for the truth and with the intent to damage Plaintiff's professional standing;

- Conspiring with courts, law enforcement, and governmental agencies to evade accountability and continue abusive conduct; and

- Committing crimes involving law enforcement, including making false statements to federal agents and orchestrating a false law enforcement action.

425. Each of the foregoing statements falsely imputes to Plaintiff criminal conduct, moral depravity, and/or professional misconduct and is defamatory per se.

426. Defendant acted with actual malice, in that she knew her statements were false or acted with reckless disregard for their truth or falsity. As alleged herein, Defendant ignored substantial contrary evidence, including judicial findings and investigative determinations, and continued to publish and republish the allegations.

427. Defendant's conduct was particularly egregious in that she deliberately leveraged her claimed professional credentials and expertise to imbue her false statements with an appearance of clinical authority. By presenting unverified allegations and personal conclusions as "clinical assessments" and "expert opinions," Defendant increased the credibility and harmful impact of her statements while disregarding the professional and ethical standards applicable to such representations.

428. Defendant published these statements widely through online articles, social media, podcasts, and third-party platforms, making them accessible to audiences within Connecticut and

throughout the United States, and did so with the expectation and intent that such statements would be further republished and amplified.

429. Plaintiff is a private individual and not a public official or public figure.

430. Defendant's defamatory statements subjected Plaintiff to public hatred, contempt, ridicule, and disgrace, and caused substantial harm to his personal and professional reputation.

431. Defendant's conduct was not isolated, but part of a sustained and ongoing course of publication and republication of false statements beginning in or about July 2023 and continuing thereafter, including after the commencement of this action.

432. As a direct and proximate result of Defendant's defamatory statements, Plaintiff has suffered and continues to suffer substantial harm, including: Presumed damages resulting from the defamatory per se nature of the statements; Actual harm to his reputation in his community and professional circles; Severe emotional distress and mental anguish; and Economic loss, including time and resources expended to clear his name and address the fallout of Defendant's publications.

## COUNT III – DEFAMATION

433. Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein, including, without limitation, the sections titled "Falsity and Disregard for Truth," "Actual Malice," and "Republication and Attribution of Statements."

434. Under Connecticut law, a claim for defamation requires that (a) the defendant published a false statement of fact, (b) the statement identified the plaintiff to a third party, (c) the

statement was communicated to one or more third parties, and (d) the plaintiff's reputation was harmed as a result.

435. Defendant published numerous statements of fact concerning Plaintiff to third parties through articles, social media, podcasts, and other communications described in this Complaint.

436. These statements were false, concerned Plaintiff, and were communicated to third parties.

437. Defendant acted with at least negligence, and in many instances with actual malice, in publishing these statements. As alleged herein, Defendant failed to undertake reasonable steps to verify the accuracy of her statements, disregarded judicial findings and investigative determinations, and departed from accepted professional standards by issuing purported "clinical" conclusions without conducting any examination of Plaintiff, including continuing to publish such statements after being placed on notice of their falsity.

438. Defendant's statements harmed Plaintiff's reputation and exposed him to public hatred, contempt, ridicule, and disgrace.

439. Defendant disseminated these statements widely through online platforms, including articles, social media, podcasts, and third-party publications, making them accessible to audiences within Connecticut and throughout the United States, and did so with the expectation and intent that such statements would be further republished and amplified.

440. Plaintiff is a private individual and not a public official or public figure.

441. Defendant's conduct was not isolated, but part of a sustained and ongoing course of publication and republication of false statements beginning in or about July 2023 and continuing thereafter, including after the commencement of this action.

442. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer substantial harm, including: Damage to his reputation and standing in the community; Personal humiliation and mental anguish; and Economic harm, including costs incurred to mitigate the effects of the defamation and loss of professional opportunities.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

443. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein, including, without limitation, the sections titled "Falsity and Disregard for Truth," "Actual Malice," and "Republication and Attribution of Statements."

444. Under Connecticut law, a claim for intentional infliction of emotional distress requires that (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of her conduct; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff's distress; and (4) the resulting emotional distress was severe.

445. Defendant engaged in a sustained and escalating course of conduct in which she repeatedly published and republished false and highly damaging statements concerning Plaintiff, as described throughout this Complaint.

446. Defendant's conduct included falsely accusing Plaintiff of, among other things, sexual abuse of his children, criminal conduct, and dangerous psychological disorders, and disseminating those accusations widely through online publications, social media, podcasts, and other platforms.

447. Defendant knew or should have known that making and widely disseminating such allegations would cause severe emotional distress to Plaintiff.

448. Defendant's conduct was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society. This includes, inter alia, repeatedly publishing allegations of child abuse and sexual misconduct, falsely portraying Plaintiff as a "psychopath," and leveraging purported professional authority to lend credibility to those accusations.

449. Defendant's conduct was particularly extreme and outrageous because she exploited her claimed position as a medical professional to validate and amplify false and defamatory allegations. By presenting unverified accusations as "clinical assessments" and "expert opinions," Defendant used the appearance of medical authority to legitimize a campaign of reputational destruction, in violation of fundamental professional and ethical standards, particularly where such accusations strike at the core of Plaintiff's identity as a parent.

450. Defendant acted intentionally, willfully, and with reckless disregard of the probability of causing Plaintiff severe emotional distress, including by continuing to publish and amplify such allegations after being placed on notice of their falsity.

451. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including humiliation, embarrassment, mental anguish, sleeplessness, anxiety, and a persistent sense of personal and professional insecurity.

452. The effects of Defendant's conduct are ongoing and continue to cause harm to Plaintiff.

453. As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to recover compensatory and punitive damages in amounts to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendant on all counts of this Complaint—including invasion of privacy by false light, defamation per se, defamation, and intentional infliction of emotional distress—and grant the following relief:

**A. Permanent Injunctive Relief:**
• An order permanently enjoining and restraining Defendant from further publishing, republishing, or otherwise disseminating the specific false and defamatory statements identified in this Complaint, or any statements substantially similar thereto, once they have been judicially determined to be false and defamatory; and

• An order permanently enjoining Defendant from continuing to host, display, or maintain the defamatory materials and content on any platform within Defendant's possession, custody, or control.

**B. Mandatory Injunctive Relief:**

- An order requiring Defendant to immediately remove, or cause to be removed, all defamatory and false light statements, materials, and audio-visual content concerning Plaintiff from any and all websites, social media platforms, podcasts, publications, or other media channels within Defendant's possession, custody, or control;

- An order requiring Defendant to take all reasonable steps to request removal of such content from third-party platforms to which Defendant provided it; and

- An order requiring Defendant to submit to this Court and to Plaintiff, within fourteen (14) days of the entry of judgment, a sworn declaration of compliance detailing the specific actions taken to effectuate such removals, including copies of all correspondence sent to and received from third-party platforms, including but not limited to those platforms or entities owned, operated, or controlled by Frank Parlato, Jr. and/or Richard Luthmann.

**C. Declaratory and Corrective Relief:**

- Declaratory Judgment: A declaration by this Court that the specific statements made by Defendant concerning Plaintiff, as identified in this Complaint, were false, defamatory, and/or placed Plaintiff in a false light; and

- Mandatory Publication: An order requiring Defendant to publish the Court's findings of falsity and/or the final judgment in this matter across all media platforms, podcasts, and social media accounts within Defendant's possession, custody, or control, in a manner and frequency reasonably calculated to reach the same audience as the original defamatory publications.

**D. Compensatory Damages:** An award of compensatory damages, including general and special damages, in an amount to be determined at trial, for the harm caused by Defendant's conduct, including but not limited to reputational injury, emotional distress, and economic losses.

**E. Presumed Damages:** An award of presumed damages consistent with the defamatory *per se* nature of Defendant's statements, without the need to prove special damages.

**F. Punitive Damages:** An award of punitive and exemplary damages as permitted by law, based on Defendant's willful, wanton, and malicious conduct.

**G. Costs and Fees:** An award of the costs of this action, including filing fees, service fees, and expert witness fees to the extent permitted by law.

**H. Interest:** An award of pre-judgment and post-judgment interest at the maximum rate allowed by law.

**I. Other Relief:** Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands a trial by jury on all issues so triable.

DATED: April 29, 2026

Respectfully submitted,

Christopher A. Ambrose, *Pro Se*
153 Middle Beach Rd.
Madison, CT 06443
203.505.1889
ca0515@aol.com